Joshua H. Haffner, SBN 188652
  jhh@haffnerlawyers.com
Alfredo Torrijos, SBN 222458
  at@haffnerlawyers.com
Vahan Mikayelyan, SBN 337023
  vh@haffnerlawyers.com
**HAFFNER LAW PC**
15260 Ventura Blvd., Suite 1520
Sherman Oaks, California 91403
Tel: (213) 514-5681 / Fax: (213) 514-5682

Shaun C. Setareh, SBN 204514
  shaun@setarehlaw.com
Thomas A. Segal, SBN 222791
  thomas@setarehlaw.com
**SETAREH LAW GROUP**
9665 Wilshire Blvd., Suite 430
Beverly Hills, California 90212
Tel: (310) 888-7771 / Fax: (310) 888-0109

Attorneys for Plaintiffs
and the Proposed Class

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

TINA CAVALLERI, an individual; MARK GLINOGA, an individual; MENGYAO YANG, an individual; on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

HERMÈS INTERNATIONAL, a French corporation and HERMÈS OF PARIS, INC., a New York corporation, and DOES 1 through 10; inclusive,

Defendants.

Case No.  3:24-cv-01707-JD

HON. JAMES DONATO

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1.  **VIOLATION OF SHERMAN ACT (15 U.S.C. §2);**

2.  **VIOLATION OF CARTWRIGHT ACT (BUS. & PROF. CODE, § 16720);**

3.  **VIOLATION OF CARTWRIGHT ACT (BUS. & PROF. CODE, § 16727); AND**

4.  **VIOLATION OF UNFAIR COMPETITION LAW (BUS. & PROF. CODE, §§ 17200, ET SEQ.)**

**JURY TRIAL DEMANDED**

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

Plaintiffs Tina Cavalleri, Mark Glinoga, and Mengyao Yang (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege upon personal knowledge as to their own acts and upon information and belief (based on the investigation of counsel), as follows:

## NATURE OF ACTION

1.    This is an antitrust and unfair business practices class action arising out of Defendants Hermès International and Hermès of Paris, Inc. ("Defendants" or "Hermès") unlawful practice of tying the purchase of Defendants' popular Birkin bags to the purchase of other Defendants' luxury clothing and accessory items.  As set forth herein, Defendants' practices are unlawful.  In this action, Plaintiffs seek compensatory and punitive damages and appropriate injunctive relief on behalf of themselves and all others similarly situated.

## PARTIES

2.    Plaintiff Tina Cavalleri ("Plaintiff Cavalleri") is a resident of California.

3.    Plaintiff Mark Glinoga ("Plaintiff Glinoga") is a resident of California.

4.    Plaintiff Mengyao Yang ("Plaintiff Yang") is a resident of California.

5.    Defendant Hermès International ("Hermès International") is a corporation, organized and existing under the laws of France, having its principal place of business located in Paris, France.  Hermès International does business in the United States, including New York, through its wholly-owned subsidiary Hermès of Paris, Inc.

6.    Defendant Hermès of Paris, Inc. ("Hermès of Paris") is a corporation, organized and existing under the laws of New York, having its principal place of business located at 55 East 59th Street, New York, New York 10022.  Hermès of Paris, Inc. is the sole authorized distributor of the Birkin handbags in the United States and has the exclusive right to sell Birkin handbags under the Hermès trademark in the United States.

7.    Hermès International and Hermès of Paris are collectively referenced herein as Hermès.

8.    The true names and capacities, whether individual, corporate, partnership, associate or otherwise of defendants Does 1 through 10, inclusive, are unknown to Plaintiffs, who therefore sue these defendants by such fictitious names.  Plaintiffs will seek leave to amend this complaint

— 2 —

to allege the true names and capacities of Does 1 through 10, inclusive, when they are ascertained.

9.      Plaintiffs are informed and believe, and based upon that information and belief allege, that the Defendants named in this complaint, including Does 1 through 10, inclusive, are responsible in some manner for one or more of the events and happenings that proximately caused the injuries and damages alleged herein.

10.      Plaintiffs are informed and believe, and based upon that information and belief allege, that each of the Defendants, including Does 1 through 10, inclusive, in performing or omitting to perform the acts alleged were, at various times, acting within the course and scope of his or her employment, authority, or apparent authority as an employee, agent and/or representative of the other Defendants.  Plaintiffs are further informed and believe, and based upon that information and belief allege, that at various other times the Defendants, in performing or omitting to perform the acts alleged hereinafter, acted outside the course and scope of their employment, authority, or apparent authority, did not utilize or operate through any corporations or businesses, and were not engaged in any business activities whatsoever, but rather, were acting outside the realm of any business individually and are thus liable for all damages alleged herein, jointly and severally.

11.      Plaintiffs are informed and believe, and based upon that information and belief allege, that each Defendant named in this complaint, including Does 1 through 10, inclusive, knowingly and willfully acted in concert, conspired and agreed together among themselves, and entered into a combination and systemized campaign of activity, to inter alia damage Plaintiffs and the Class and to otherwise consciously and/or recklessly act in derogation of the rights of Plaintiffs and the Class, and the trust reposed by Plaintiffs and the Class in each of the Defendants, the acts being negligently and/or intentionally inflicted.  This conspiracy, and Defendants' concerted actions, were such that, to the information and belief of Plaintiffs and the Class, and to all appearances, Defendants, represented a unified body so that the actions of one Defendant were accomplished in concert with, and with knowledge, ratification, authorization and approval of each of the other Defendants.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the Sherman Act, 15 U.S.C. § 2.

13.     This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as those that give rise to the federal claims.

14.     This Court has personal jurisdiction over Defendants because they conduct business in California and have sufficient minimum contacts with California.  Defendants also advertise and solicit business in California.

15.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District:  Defendants gain significant revenue and profits from doing business in this District, Class Members affected by the practices asserted herein reside in this District, and Defendants employ numerous people in this District.  Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District.  Defendants' conduct had the intended and foreseeable effect of causing injury to persons residing in this District.

**FACTUAL ALLEGATIONS**

**A.     Hermès.**

16.     Hermès is a world-famous designer and producer of high-quality merchandise including, *inter alia*, luxury handbags, apparel, scarves, jewelry, fashion accessories, and home furnishings.

17.     For decades, Hermès has developed its reputation and distinctive image.

18.     Hermès' origins date back to 1837, when it began designing and manufacturing high quality harnesses for horses.  During the twentieth century, Hermès expanded its business to include handbags, personal leather goods, and apparel.

19.     Hermès is the exclusive distributor or licensor in the United States of its merchandise.

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

20.     Hermès sells its products directly to consumers through Hermès-owned retail stores and (except for Birkin handbags) through its website at www.hermes.com.   Hermès currently operates approximately 43 retail stores in the United States with 8 of those retail stores located in California.

**B.     The Birkin Handbag.**

21.     Hermès is well known for its famous Birkin and Kelly handbags (collectively "Birkin handbag" or "Birkin bag"), which are exclusive Hermès designs.   Defendants are the exclusive distributors of the Birkin bag in the United States.

22.     Each Birkin handbag is handcrafted from the finest leather by experienced artisans in France.   The manufacturing of a single Birkin handbag requires many hours of an artisan's time.   The intensive labor and craftmanship and high-quality leathers required make the Birkin handbag difficult to produce and expensive.   The price of a Birkin handbag ranges from thousands of dollars to over one hundred thousand dollars.

23.     "The desirability of an Hermès Birkin handbag – a symbol of rarefied wealth – is such that not even a global pandemic can dull demand for it."   In the second quarter of 2021, Hermès' sales for the leather and saddlery division, which includes the Birkin handbags, more than doubled from a year ago and rose by 24% from their pre-pandemic June 2019 levels.

24.     Despite the price and exclusivity, the Birkin handbag has become a household name and well known by the general public, both in name and by its distinctive design.

25.     The Birkin handbag is an icon of fashion, and the primary product associated with Hermès.   A September 2021 Vanity Fair article noted "There is a kind of fashion object so long lasting, so tirelessly wanted that its name becomes recognizable, a metonym for the brand that made it: the Air Jordan, the Love bracelet.   Few brands, successful though they may be, attain that kind of saturation."

26.     The relevant market at issue is the market and/or submarket of luxury handbags in the United States, within which Defendants, through their Birkin handbags, exercise substantial market power.   Defendants' iconic Birkin bag, limited production, and high demand contribute to their dominant position in this market.   Defendants' dominant position in this market,

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

characterized by high barriers to entry and brand recognition, allows them to control prices and engage in the anti-competitive conduct alleged herein to the detriment of consumers.

27. The luxury handbag market is characterized by high price points, superior craftsmanship and materials, and investment potential. The Birkin bag's exclusivity, limited availability, and iconic status make it difficult to find a perfect substitute. While the Birkin bag occupies a distinct and exclusive niche within the luxury handbag market, a limited number of handbags may be considered potential substitutes for cross-elasticity purposes. These alternatives, primarily consisting of the most high-end offerings from elite designer and luxury brands like Gucci, Prada, and Louis Vuitton, nonetheless lack the unique brand identity and exclusivity that define the Birkin bag, rendering them imperfect substitutes. This limited substitutability reinforces the Birkin bag's market power and enables Defendants to engage in anti-competitive practices.

28. While precise figures for Hermès' market share in the luxury handbag market are not publicly available, the available information strongly suggests Hermès' significant presence in and dominance of the luxury handbag market. While these sources do not provide an exact percentage, it is clear that Hermès holds a substantial share of the luxury handbag market in 2023.

    a. Hermès reported strong financial performance in 2023, with significant growth in their leather goods and saddlery division (which includes handbags).[1] This suggests a healthy market share and continued demand for their products.

    b. Publications like LUXlife Magazine[2] and PurseBop[3] highlighted Hermès' success in 2023, particularly with the Birkin bag, despite challenges faced by the broader luxury market. This further emphasizes their strong position.

29. Defendants have made the following statements and admissions related to the

---

[1] https://assets-finance.hermes.com/s3fs-public/node/pdf_file/2024-02/1707422069/hermes_20240209_pr_2023fullyearresults_va.pdf

[2] https://www.lux-review.com/as-luxury-sales-slumped-in-2023-hermes-surpassed-expectations/

[3] https://www.pursebop.com/hermes-revenues-rise-22-in-first-half-of-2023-with-no-decline-in-united-states/ ; https://www.pursebop.com/hermes-birkins-and-kelly-help-lift-q1-2023-sales-23/

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

relevant market and its market power:

    a.  In a January 9, 2023, press release Defendants stated it has "forge[d] the singularity of Hermès . . ."

    b.  On February 9, 2024, Axel Dumas, Executive Chairman of Hermes, said: "In 2023, Hermes has once again cultivated its singularity" and said "[t]hanks to its unique business model."

    c.  In its 2023 Universal Registration Document, Defendants stated "Hermes holds a unique position in the luxury market."

    d.  In a March 2024 letter to shareholders, Hermes stated it has "continued to consolidate its position as one of the highest-performing companies in the Luxury Products and Cosmetics sector in the MSCI ESG, Moody's ESG, and Sustainalytics ratings."

    e.  In a complaint Defendants filed in an action entitled *Hermes International v. Mason Rothschild*, USDC, Southern District of New York, filed 1/14/22, Defendants sued for infringement of "the distinctive design of the BIRKIN handbag," and alleged that:

        i.  "There's nothing more iconic than the Hermès Birkin bag";

        ii.  "A Birkin handbag is a highly valuable asset in the physical world,"

        iii.  The Birkin's "mysterious waitlist, intimidating price tags and extreme scarcity have made it a highly covetable 'holy grail' handbag that doubles as an investment or store of value";

        iv.  "Hermès has sold millions of dollars' worth of Birkin handbags in significant quantities since its inception in 1986. Such sales have occurred in the United States, France, and throughout the world"; and

        v.  "The Birkin handbag has been recognized as one of the best investments any person can make with its increasing value beating returns from the stock market and even gold."

30.    The luxury handbag market, recognized as a distinct economic entity by both the

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

industry and consumers, operates independently from the general handbag market. Luxury handbags are characterized by their hand-crafted or artisan construction, exceptionally high price points often exceeding tens of thousands of dollars, and unique production processes emphasizing high-quality materials and craftsmanship. This market caters to a niche clientele of affluent consumers, utilizes specialized vendors and sales associates with expertise in high-end products, and exhibits a low sensitivity to price fluctuations.

31.     The luxury handbag market tends to be relatively inelastic. Luxury handbag buyers are typically less price-sensitive than consumers of ordinary goods. They are often high-income individuals who view these items as status symbols, investments, or collectibles. Therefore, a price increase may not significantly deter their demand. True luxury handbags, like the Birkin bag, have a unique brand identity, craftsmanship, and exclusivity that cannot be easily replicated. While there are other high-end brands, they may not be seen as perfect substitutes for a specific luxury handbag. This lack of substitutes reduces price elasticity.

32.     Defendants have exploited the unique characteristics of the luxury handbag market, including its relative inelasticity and affluent consumer base, to engage in a pattern of anti-competitive conduct. This market, characterized by consumers who view these items as status symbols, investments, or collectibles, demonstrates reduced price sensitivity, allowing Defendants to artificially inflate the true prices of their handbags (as opposed to the nominal, retail price of the Birkin bags). By leveraging the Birkin bag's unique brand identity, craftsmanship, and exclusivity, which are not easily replicated by other high-end brands, Defendants have created a market with limited direct substitutes, enabling them to maintain supracompetitive prices and engage in unlawful restraints of trade, including the illegal tying arrangements alleged herein.

33.     Defendants have systematically exploited their dominant market position in the luxury handbag market to engage in a deceptive and manipulative pricing scheme, artificially inflating the true cost of their Birkin handbags and reaping supracompetitive profits. The nominal retail price of a Birkin bag is a facade, masking a hidden lottery system that forces consumers to purchase substantial amounts of Hermès Ancillary Products to "qualify" for the mere opportunity to buy a Birkin. This predatory practice not only drives up the true price of the Birkin bag – which

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

includes the cost of these coerced Ancillary Product purchases – but also generates additional revenue for Defendants from consumers who never "qualify" and are left with Hermès Ancillary Products that they never would have purchased but for their desire to acquire a Birkin bag. This scheme represents a blatant abuse of market power and a deliberate deception of consumers, resulting in substantial financial harm to the Class.

34.    The artificial suppression of the nominal retail price of Birkin handbags is evidenced by their robust resale value, which consistently and significantly exceeds the original purchase price. This stark disparity between the initial cost and the secondary market valuation unequivocally demonstrates that the advertised price is not the true price consumers ultimately pay and exposes Defendants' manipulation of the market to extract supracompetitive profits.

35.    For example, a standard leather Birkin handbag can resell for 1.5 to 3 times its original retail price, while exotic skin Birkin bags command even higher premiums, often fetching 2 to 5 times their original price or more. A Birkin 25 in Togo leather with gold hardware, typically retailing for around $10,000, can easily command $20,000 or more on the resale market. This extraordinary appreciation is supported by a study conducted by Baghunter, an online marketplace for luxury handbags, which found that Birkin bags have offered an average annual return of 14.2% over the past 35 years, with their value never decreasing.[4]

**C.    Defendants' Illegal Tying with the Birkin Handbag.**

36.    The unique desirability, incredible demand and low supply of Birkin handbags gives Defendants incredible market power. Defendants implemented a scheme to exploit this market power by requiring consumers to purchase other, ancillary products from Defendants before they will be given an opportunity to purchase a Birkin handbag. With this scheme Defendants were able to effectively increase the price of Birkin handbags and, thus, the profits that Defendants earn from Birkin handbags. The tied products include designer shoes, scarves, belts, clothing, jewelry, and home goods sold by Hermès ("Ancillary Products"). There is a market for each of these tied products.

---

[4]  https://baghunter.com/pages/hermes-birkin-values-research-study

— 9 —

37. Birkin handbags cannot be purchased from Defendants through the Hermès website. Instead, consumers can only purchase Birkin handbags from Defendants by physically going to a *Hermès* retail store. However, unlike most consumer products – and most other products sold by Defendants – consumers cannot simply walk into a *Hermès* retail store, pick out the Birkin handbag they want and purchase it. Birkin handbags are never publicly displayed for sale at *Hermès* retail stores. Indeed, it is often the case that there are no Birkin handbags *at all* at *Hermès* retail stores or, if there are, there are only one, two or at most three Birkin handbags. But even if there are Birkin handbags at a particular *Hermès* retail store, the handbags will not be displayed on the sales floor for the general public. In fact, most consumers will never be shown a Birkin handbag at *Hermès* retail store. Typically, only those consumers who are deemed worthy of purchasing a Birkin handbag will be shown a Birkin handbag (in a private room). The chosen consumer will be given the opportunity to purchase the specific Birkin handbag that they are shown. Consumers cannot order a Birking handbag at the retail location. For all practical purposes, there is no way to order a bag in the style, size, color, leather, and hardware that a consumer wants.

38. Hermès Sales Associates are tasked by Defendants with selecting those consumers who are qualified to purchase Birkin handbags. These sales associates are directed by Defendants to only offer Birkin handbags to consumers who have established a sufficient "purchase history" or "purchase profile" with Defendants of Defendants' ancillary products such as shoes, scarves, belts, clothing, jewelry and home goods. Only once a consumer has a sufficient purchase history or purchase profile with Defendants, will the consumer be offered the opportunity to purchase a Birkin handbag.

39. Defendants have designed the compensation structure of their Sales Associates to ensure that they follow Defendants' policy of only selling Birkin handbags to consumers who have a sufficient purchase history of ancillary products. Hermès Sales Associates are paid by the hour and also receive a commission on their sales. The commission rates paid by Defendants to sales associates differ based on the type of product sold. Sales Associates are paid 3% on ancillary products such as shoes, scarves, belts, jewelry and home goods; they are paid a 1.5% commission

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

on non-Birkin handbags, and they receive **no** commission whatsoever on the sale of Birkin handbags.  Although Hermès Sales Associates receive **no** commission on the most valuable and sought-after products sold by their employer, they are instructed by Defendants to use Birkin handbags as a way to coerce consumers to purchase ancillary products sold by Defendants (for which the sales associates receive a 3% commission) in order to build-up the purchase history required to be offered a Birkin handbag.

40.    In this way, Defendants are able to use their Sales Associates to implement Defendants' illegal tying arrangement.

**D.    Plaintiffs' Attempts to Purchase a Birkin Handbag.**

41.    Plaintiff Cavalleri has spent tens of thousands of dollars at Hermès, and had been coerced into purchasing Ancillary Products in order to obtain access to Hermès Birkin bags, based on the practices alleged herein.  In or about September 2022, Plaintiff contacted Hermes about purchasing another Birkin bag but was told specialty bags are going to "clients who have been consistent in supporting our business."  Plaintiff Cavalleri understood she would have to spend more on Ancillary Products to obtain access to another Birkin Handbag.  As a result, Plaintiff Cavalleri was unable to purchase another Birkin Handbag in September 2022.

42.    In or about 2023, Plaintiff Glinoga sought to purchase a Birkin Handbag, but was counseled by Defendant's sales associates to purchase Ancillary Products in order to potentially obtain a Berkin Handbag.  Plaintiff Glinoga made multiple attempts to purchase a Birkin bag, but was told on each occasion he needed to purchase other items and accessories.  As a result, Plaintiff Glinoga was unable to purchase a Birkin Handbag.

43.    In or about the Fall of 2023, Plaintiff Yang sought to purchase a Birkin bag at Defendants' San Francisco Hermès store.  Plaintiff Yang was informed by Defendants she would have to purchase Ancillary Products in order to obtain a Birkin bag and spent over $10,000 on Ancillary Products in order to purchase a Birkin bag.  Plaintiffs are informed and believe, and on that basis allege, that Defendants tied Plaintiffs' access to purchase a Birkin Handbag to a requirement that they spend more on other items, pursuant to the unlawful tying arrangement alleged herein.  Plaintiffs have suffered injury as a result of Defendants' unlawful practice,

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

including but not limited to, being required to expend money to purchase Ancillary Products from Defendants.  Plaintiffs have suffered injury as a result of Defendants' unlawful practice by being denied the opportunity to obtain a Birkin bag, which as set forth herein, can be resold at a higher price, because of Defendants' tying practices.  Plaintiffs are informed and believe, and on that basis allege, that Defendants' unlawful practice also causes economic harm because it reduces competition in the market for the tied products.  Plaintiffs are informed and believe, and on that basis allege, that Defendants' competitors in the tied markets cannot make sales for Ancillary Products that are purchased as a result of the coercive effect of Defendants' tying practice.

## CLASS ACTION ALLEGATIONS

44.     Plaintiffs bring this action on behalf of themselves and as representatives of all others who are similarly situated.  Pursuant to Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following class and subclass that are initially defined as follows:

> **Class**: All residents of the United States who, from four years prior to the filing of this complaint until the date that notice of this class action is disseminated to the class, purchased or were asked to purchase Ancillary Products in order to purchase a Birkin Handbag (the "Class").

> **Subclass**:  All residents of California who, from four years prior to the filing of this complaint until the date that notice of this class action is disseminated to the class, purchased or were asked to purchase Ancillary Products in order to purchase a Birkin Handbag (the "Subclass").

45.     For purposes of the above class definitions, "*Ancillary Products*" include shoes, scarves, belts, jewelry, home goods sold, and other products sold at Hermès' branded retail boutiques, for which Sales Agents receive a commission, but excludes any Birkin, Kelly or

— 12 —

Constance branded handbag.  For purposes of the above class definitions, "*Birkin Handbag*" shall consist of any handbag manufactured and sold by Hermès' under the tradename of "Birkin" or "Kelly."

46.    Excluded from each of the above classes are Defendants, including any entity in which Defendants have a controlling interest, are a parent or subsidiary, or which are controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendants.  Also excluded are the judges and court personnel in this case and any members of their immediate families.

47.    Plaintiffs reserve the right to amend or modify the above class definition with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

48.    This action has been brought and may be properly maintained on behalf of the classes proposed herein under Rule 23 of the Federal Rules of Civil Procedure.

49.    <u>Numerosity.</u> Fed. R. Civ. P. 23(a)(1).  The members of each class and subclass are so numerous that joinder of all members is impractical.  Plaintiffs are informed and believe that there are thousands of members of each of the classes.

50.    <u>Commonality and Predominance.</u> Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to each class, which predominate over any questions affecting individual members of each respective class.  These common questions of law and fact include, without limitation:

  a.  Whether the Birkin handbags and Defendants' ancillary products are separate and distinct;

  b.  Whether Defendants implemented a policy to ensure that their sales associates would only sell Birkin handbags to consumers with a sufficient purchase history of Defendants' ancillary products; and

  c.  Whether Defendants have sufficient economic power in the market for Birkin handbags to coerce at least some consumers into purchasing Defendants' ancillary products;

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

d.   Whether Defendants unlawfully tied the sale of Birkin handbags to the sale of Ancillary products; and

e.   Whether Plaintiffs and the members of the Class and Subclass have been damaged by the wrongs complained of herein, and if so, the measure of those damages and the nature and extent of other relief that should be afforded.

51.   Typicality. Fed. R. Civ. P. 23 (a)(3).  Plaintiffs' claims are typical of the claims of the classes they seek to represent.  Plaintiffs and all Class and Subclass members were exposed to uniform practices and sustained injuries arising out of and caused by Defendants' conduct.

52.   Adequacy. Fed. R. Civ. P. 23(a)(4).  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class and Subclass.

53.   Superiority. Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class and Subclass member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, Class and Subclass members will continue to suffer losses and Defendants' misconduct will proceed without remedy.  Even if Class or Subclass members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.  Finally, Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

///

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

**FIRST CLAIM FOR RELIEF**
**Violation of the Sherman Act**
*15 U.S.C. § 2*
**(By Plaintiffs and the Class Against Defendants)**

54.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

55.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants under federal law.

56.     The Sherman Act prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations." 15 U.S.C. §2.

57.     As detailed above, Defendants have unlawfully tied their Birkin handbags to their Ancillary Products through their sales associate incentive program. A market exists for both the tying and tied products, the Berkin handbag and ancillary products, respectively.

58.     Defendants have sufficient economic power in the tying market, the luxury handbag market, to affect competition in the tied market, ancillary products. Defendants willfully and intentionally engage in predatory, exclusionary, and anticompetitive conduct with the design, purpose, and effect of unlawfully maintaining their market and/or monopoly power.

59.     The availability of the Birkin handbags is conditioned on customers purchasing Ancillary Products from Defendants. In other words, consumers are coerced into purchasing Ancillary Products from Defendants by virtue of wanting to purchase the Birkin handbags. This is anticompetitive, tying conduct.

60.     The tying product, the Birkin handbags, is separate and distinct from the tied products, the Ancillary Products required to be purchased by consumers, because consumers such as Plaintiffs have alternative options for the Ancillary Products and would prefer to choose among them independently from their decision to purchase Birkin handbags. Defendants' unlawful tying arrangements thus ties two separate products that are in separate markets.

61.     Defendants and the Birkin handbag have sufficient economic power in the market for luxury handbags to coerce at least some consumers into purchasing ancillary products from

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

1   Defendants.  Defendants' conduct affects and has affected a substantial volume of commerce, far

2   exceeding a de minimis amount.

3   62.   Plaintiffs and the other members of the Class were harmed and Defendants'

4   violation of the Sherman Act was a substantial factor in causing this harm.

5   **SECOND CLAIM FOR RELIEF**
   **Violation of the Cartwright Act**
6   ***Cal. Bus. & Prof. Code, § 16720***
   **(By Plaintiffs and the Subclass Against Defendants)**
7

8   63.   Plaintiffs reallege and incorporate by reference the allegations contained in the

9   preceding paragraphs, inclusive, of this Complaint, as though fully set forth herein and, to the

10  extent necessary, plead this cause of action in the alternative.

11  64.   Plaintiffs bring this claim individually and on behalf of the members of the Subclass

12  against Defendants under California law.

13  65.   Defendants' acts and practices detailed herein violate the Cartwright Act, Cal. Bus.

14  & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or

15  more persons to restrain trade or commerce, or to prevent market competition. (Cal. Bus. & Prof.

16  Code, §§ 16720, 16726.)

17  66.   Under the Cartwright Act, a "combination" is formed when the anticompetitive

18  conduct of a single firm coerces other market participants to involuntarily adhere to the anti-

19  competitive scheme.

20  67.   The Cartwright Act also makes it "unlawful for any person to lease or make a sale

21  or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within

22  the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the

23  condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in

24  the goods, merchandise, machinery, supplies, commodities, or services of a competitor or

25  competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such

26  condition, agreement or understanding may be to substantially lessen competition or tend to create

27  a monopoly in any line of trade or commerce in any section of the State." (Cal. Bus. & Prof. Code,

28  § 16727.)

— 16 —

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

68.     As detailed above, Defendants have unlawfully tied their Birkin handbags to their Ancillary Products through their Sales Associate incentive program.

69.     Defendants have sufficient economic power in the tying market for luxury handbags, to affect competition in the tied market, Ancillary Products.

70.     The availability of the Birkin handbags is conditioned on customers purchasing Ancillary Products from Defendants.   In other words, consumers are coerced into purchasing Ancillary Products from Defendants by virtue of wanting to purchase the Birkin handbags.

71.     The tying product, the Birkin handbags, is separate and distinct from the tied products, the Ancillary Products required to be purchased by consumers because consumers such as Plaintiffs have alternative options for the ancillary products and would prefer to choose among them independently from their decision to purchase Birkin handbags.  Defendants' unlawful tying arrangements thus tie two separate products that are in separate markets.

72.     Defendants have sufficient economic power in the market for luxury handbags to coerce at least some consumers into purchasing Ancillary Products from Defendants.

73.     Plaintiffs and the other members of the Subclass were harmed and Defendants' violation of the Carwright Act was a substantial factor in causing this harm.

WHEREFORE, Plaintiffs and the Class pray judgment against Defendants as hereafter set forth.

### THIRD CLAIM FOR RELIEF
**Violation of the Cartwright Act**
*Cal. Bus. & Prof. Code, § 16727*
**(By Plaintiffs and the Subclass Against Defendants)**

74.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

75.     Plaintiffs bring this claim individually and on behalf of the members of the Subclass against Defendants under California law.

76.     Defendants' acts and practices detailed herein violate the Cartwright Act, Cal. Bus. & Prof. Code § 16727, which makes it "unlawful for any person to lease or make a sale or contract

for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." (Cal. Bus. & Prof. Code, § 16727.)

77.   As detailed above, Defendants have unlawfully tied their Birkin handbags to their ancillary products through their sales associate incentive program.

78.   Defendants have sufficient economic power in the tying market for luxury handbags to affect competition in the tied market, Ancillary Products.

79.   The availability of the Birkin handbags is conditioned on customers purchasing Ancillary Products from Defendants.   In other words, consumers are coerced into purchasing Ancillary Products from Defendants by virtue of wanting to purchase the Birkin handbags.

80.   The tying product, the Birkin handbags, is separate and distinct from the tied products, the Ancillary Products required to be purchased by consumers, because consumers such as Plaintiffs have alternative options for the Ancillary Products and would prefer to choose among them independently from their decision to purchase Birkin handbags.  Defendants' unlawful tying arrangements thus ties two separate products that are in separate markets.

81.   Defendants have sufficient economic power in the market for Birkin handbags to coerce at least some consumers into purchasing ancillary products from Defendants.

82.   Plaintiffs and the other members of the Subclass were harmed and Defendants' violation of the Carwright Act was a substantial factor in causing this harm.

WHEREFORE, Plaintiffs and the Class pray judgment against Defendants as hereafter set forth.

/ / /

/ / /

— 18 —

**FOURTH CLAIM FOR RELIEF**
**Violation of California's Unfair Competition Law**
*Cal. Bus. & Prof. Code, § 17200, et seq.*
**(By Plaintiffs and the Subclass Against Defendants)**

83.  Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

84.  Plaintiffs bring this claim individually and on behalf of the members of the Subclass against Defendants under California law.

85.  Plaintiffs have standing to pursue this cause of action as Plaintiffs have suffered injury in fact and have lost money or property as a result of Defendants' actions as delineated herein.

86.  Defendants' scheme, as delineated herein, constitutes unlawful business practices in violation of California Business and Professions Code sections 17200, *et seq.*

87.  Defendants' business practices, as alleged herein, violate the "unlawful" prong of California Business & Professions Code sections 17200, *et seq.* because Defendants' conduct violates, *inter alia*, the Cartwright Act, the Sherman Act, and Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1).

88.  Defendants' business practices, as alleged herein, violate the "unfair" prong of California Business & Professions Code sections 17200, *et seq.* under both the "tethering" and "balancing" tests for unfair business practices.

89.  Defendants' business practices, as alleged herein, are unfair under the "tethering" test because their conduct: (i) contravenes the policy and spirit of the Sherman Act and Cartwright Act's prohibitions on tying arrangements; (ii) results in effects comparable to, or the same as, a direct violation of these anti-tying prohibitions; and (iii) poses a significant threat to or harm on competition within the market.

90.  Defendants' business practices, as alleged herein, violate the "balancing" test for unfair business practices because the harm to consumers outweighs the utility, if any, of the challenged conduct.

— 19 —

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

91. The consumer injury resulting from Defendants' business practices, as alleged herein, is substantial, not outweighed by any countervailing benefits to consumers or to competition, and not an injury that the consumers themselves could reasonably have avoided.

92. Accordingly, Defendants violated, and continue to violate, California Business and Professions Code section 17200's proscription against engaging in unlawful and/or unfair business acts or practices.

93. As a direct and proximate result of Defendants' unlawful business practices, Plaintiffs and the Class have suffered injury in fact and lost money or property, in that they purchased ancillary products from Defendants that they did not want or could have purchased elsewhere.

94. Pursuant to California Business and Professions Code section 17203, Plaintiffs and the Class seek an order of this court enjoining Defendants from continuing to engage in unlawful, unfair, or deceptive business practices and any other act prohibited by law, including those acts set forth in the complaint.

95. Plaintiffs and the Subclass also seek an order requiring Defendants to make full restitution of all monies they wrongfully obtained from Plaintiffs and the Class.

WHEREFORE, Plaintiffs and the Class pray judgment against Defendants as hereafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment against Defendants, as follows:

1. An order certifying appropriate classes and/or subclasses, designating Plaintiffs as the class representatives and their counsel as class counsel;

2. An order enjoining Defendants from continuing to engage in the practices complained of herein;

3. An award of restitution, damages, and disgorgement to Plaintiffs and the Class and Subclass in an amount to be determined at trial;

4. An order requiring Defendants to pay both pre- and post-judgment interest on any

— 20 —

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

amounts awarded, as allowed by law;

5.     An award of costs and attorneys' fees, as allowed by law; and

6.     Such other or further relief as may be appropriate.


Dated:  May 30, 2024                         HAFFNER LAW PC

                                             By:  /s/ Joshua H. Haffner
                                                  Joshua H. Haffner
                                                  Alfredo Torrijos
                                                  Vahan Mikayelyan

                                             SETAREH LAW GROUP
                                                  Shaun C. Setareh
                                                  Thomas A. Segal

                                             *Counsel for Plaintiffs and the Proposed Class and Subclass*

**FIRST AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

1

**DEMAND FOR JURY TRIAL**

2      Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a

3   trial by jury of any and all issues in this action so triable of right.

4

5   Dated:  May 30, 2024                    HAFFNER LAW PC

6
                                           By:  /s/ Joshua H. Haffner
7                                               Joshua H. Haffner
8                                               Alfredo Torrijos
                                               Vahan Mikayelyan
9
                                           SETAREH LAW GROUP
10                                              Shaun C. Setareh
11                                              Thomas A. Segal

12                                         *Counsel for Plaintiffs and the Proposed Class and*
                                           *Subclass*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

— 22 —