1   LATHAM & WATKINS LLP
        Christopher S. Yates (SBN 161273)
2       Belinda S Lee (SBN 199635)
        Ashley M. Bauer (SBN 231626)
3   505 Montgomery Street, Suite 2000
    San Francisco, California 94111-6538
4   Telephone: 415.391.0600
    Facsimile: 415.395.8095
5   Email: Chris.Yates@lw.com
            Belinda.Lee@lw.com
6           Ashley.Bauer@lw.com

7   LATHAM & WATKINS LLP
        Peter E. Davis (SBN 320256)
8   555 Eleventh Street, NW, Suite 1000
    Washington, DC 20004-1304
9   Telephone: 202.637.2200
    Facsimile: 202.637.2201
10  Email:   Peter.Davis@lw.com

11  Attorneys for Defendants
    *Hermès of Paris, Inc. and Hermès International*
12

13                  IN THE UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                        SAN FRANCISCO DIVISION

16
    TINA CAVALLERI, an individual; MARK        Case No. 3:24-cv-01707-JD
17  GLINOGA, an individual; MENGYAO
    YANG, an individual; on behalf of themselves **DEFENDANTS' NOTICE OF MOTION**
18  and all others similarly situated,          **AND MOTION TO DISMISS**
                                                **PLAINTIFFS' FIRST AMENDED**
19                 Plaintiffs,                  **CLASS ACTION COMPLAINT;**
                                                **MEMORANDUM OF POINTS AND**
20            vs.                               **AUTHORITIES IN SUPPORT**
                                                **THEREOF**
21  HERMÈS INTERNATIONAL, a French
    corporation and HERMÈS OF PARIS, INC., a    Date:    September 19, 2024
22  New York corporation, and DOES 1 through    Time:    10:00 AM
    10; inclusive,                              Place:   Courtroom 11, 19th Floor
23                                              Judge:   Hon. James Donato
                   Defendants.
24

25

26

27

28

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO PLAINTIFFS AND TO THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on September 19, 2024, at 10:00 a.m., or as soon thereafter as the matter may be heard by the Court, in the courtroom of the Honorable James Donato, Courtroom 11, 19th Floor, United States District Court, located at 450 Golden Gate Avenue, San Francisco, California, Defendants Hermès of Paris, Inc. and Hermès International will and hereby do move the Court for an order dismissing Plaintiffs' First Amended Class Action Complaint, Dkt. 33 ("Amended Complaint"), on the ground that it fails to state a claim under Federal Rule of Civil Procedure 12(b)(6).  This Motion is based on this Notice, the supporting Memorandum of Points and Authorities, the complete files and records in this action, and any additional material and arguments as may be considered in connection with the hearing.

Plaintiffs have already amended their claims in response to Hermès' prior motion to dismiss, and further amendment would be futile.  Defendants thus seek an order pursuant to Federal Rule of Civil Procedure 12(b)(6) dismissing with prejudice Plaintiffs' claims for failure to state a claim upon which relief can be granted.  *See, e.g.*, *Gadda v. State Bar of Cal.*, 511 F.3d 933, 939 (9th Cir. 2007) (affirming dismissal with prejudice where there was no "possible way that [plaintiff] could cure his complaint to survive dismissal upon amendment," and "allowing amendment would be futile").

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF ISSUES TO BE DECIDED ................................................. 2

III.  BACKGROUND ................................................................................................ 3

IV.   ARGUMENT ..................................................................................................... 5

    A.    Plaintiffs Do Not Plead A Sherman Act Section 2 Tying Claim ........................... 5

        1.    The Amended Complaint Does Not Allege That Hermès Has Market Or Monopoly Power In The Alleged Luxury Handbag Market ................................................................................. 6

        2.    Plaintiffs Do Not Plead Willful Maintenance Or Acquisition Of Monopoly Power As Required By Section 2 ................... 9

        3.    The Amended Complaint Does Not Define A Viable Tied Product Market In Which Competitive Effects Can Be Assessed ............................................................................................. 10

        4.    Plaintiffs Do Not Plead Facts Showing Antitrust Standing ..................... 12

    B.    Plaintiffs' State Law Claims Also Fail ................................................................. 14

        1.    Plaintiffs Do Not State A Tying Claim Under The Cartwright Act ................................................................................ 14

        2.    Plaintiffs Do Not State A Claim Under The UCL ................................. 14

V.    CONCLUSION ................................................................................................. 15

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

## CASES

*Ahn v. Stewart Title Guaranty Co.*,
    93 Cal. App. 5th 168 (Cal. Ct. App. 2023) ...................................................................................14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................................................5

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................................................5, 8

*Belton v. Comcast Cable Holdings, LLC*,
    151 Cal. App. 4th 1224 (Cal. Ct. App. 2007) ...................................................................14, 15

*Blough v. Holland Realty, Inc.*,
    574 F.3d 1084 (9th Cir. 2009) ...............................................................................6, 12, 13

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) .................................................................................................13

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (Cal. Ct. App. 2001) ........................................................................15

*Coronavirus Reporter v. Apple, Inc.*,
    85 F.4th 948 (9th Cir. 2023) .......................................................................................................10

*Dominick v. Collectors Universe, Inc.*,
    No. 2:12–cv–04782, 2012 WL 4513548 (C.D. Cal. Oct. 1, 2012).........................................8

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ...............................................................................................6, 9, 15

*Farmers Insurance Exchange v. Superior Court*,
    2 Cal. 4th 377, 826 P.2d 730 (Cal. 1992) ..........................................................................14

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) .....................................................................................................7

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
    733 F. App'x 380 (9th Cir 2018) ...........................................................................................7, 8

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
    627 F.2d 919 (1980).........................................................................................................................7, 8

*Illinois Tool Works Inc. v. Independent Ink, Inc.*,
    547 U.S. 28 (2006)...........................................................................................................................1, 9

**Page(s)**

*Intel Corp. v. Fortress Investment Group,*
    511 F. Supp. 3d 1006 (N.D. Cal. 2021) ................................................................................7

*Marsh v. Anesthesia Services Medical Group, Inc.,*
    200 Cal. App. 4th 480 (Cal. Ct. App. 2011) .......................................................................15

*Morrison v. Viacom, Inc.,*
    66 Cal. App. 4th 534 (Cal. Ct. App. 1998) .........................................................................14

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.,*
    No. 21-cv-00540, 2022 WL 2791201 (E.D. Cal. July 15, 2022).....................................7, 12

*Ohio v. American Express Co.,*
    585 U.S. 529 (2018).............................................................................................................6

*In re Qualcomm Antitrust Litigation,*
    No. 17-md-02773, 2023 WL 121983 (N.D. Cal. Jan. 6, 2023) ...........................................11

*Rebel Oil Co. v. Atlantic Richfield Co.,*
    51 F.3d 1421 ....................................................................................................................6, 7

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC,*
    532 F.3d 963 (9th Cir. 2008) .................................................................................... *passim*

*Sheridan v. Marathon Petroleum Co.,*
    530 F.3d 590 (7th Cir. 2008) ..............................................................................................5

*Somers v. Apple, Inc.,*
    729 F.3d 953 (9th Cir. 2013) .............................................................................................12

*Teradata Corp. v. SAP SE,*
    570 F. Supp. 3d 810 (N.D. Cal. 2021) ...............................................................................10

*Truck-Rail Handling, Inc. v. Burlington Northern & Santa Fe Railway Co.,*
    244 F. App'x 130 (9th Cir. 2007) ......................................................................................10

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004)...........................................................................................................13

*In re Webkinz Antitrust Litigation,*
    695 F. Supp. 2d 987 (N.D. Cal. 2010) ...............................................................................12

**STATUTES**

15 U.S.C. § 2 ........................................................................................................................2

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFS.' MOT. TO DISMISS FAC
CASE NO. 3:24-CV-01707-JD

**Page(s)**

Cal. Bus. & Prof. Code
   § 16720........................................................................................................................2
   § 16727........................................................................................................................2
   § 17200...................................................................................................................2, 14

**OTHER AUTHORITIES**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (2023) ...............................................................10

# I.    INTRODUCTION

Plaintiffs' new allegations come nowhere close to fixing the fatal flaws in their claims. But they do reveal the true motive behind their lawsuit: Plaintiffs want on-demand access to Birkin and Kelly handbags so they can immediately resell them at higher prices. If that doesn't sound like the basis for a monopolization claim, it's because it isn't one. Nothing in the antitrust or unfair competition laws compels that outcome.

Despite the continued unfounded assertions in Plaintiffs' Amended Complaint, Hermès does not require a customer to purchase any other products before purchasing a Birkin or Kelly handbag. But, even if it did, that would not violate the law. "A tying arrangement is a device used by a seller with market power in one product market [the tying product] to extend its market power to a distinct product market [the tied product]." *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (citation omitted). The Supreme Court has recognized that tying arrangements can be "procompetitive." *Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 36 (2006). Thus, tying does not violate the law unless the seller uses "market power over the tying product" as leverage to "exclude other sellers of the tied product." *Rick-Mik*, 532 F.3d at 971 (citation omitted). Here, even with their conclusory new allegation of a "luxury handbag market," Am. Compl. ¶ 27, Plaintiffs cannot plead that: (1) Hermès has monopoly power in the tying product market; or (2) Hermès is using monopoly power to foreclose competition in all of the supposedly tied products (watches, shoes, blankets, etc.).

Plaintiffs' Sherman Act Section 2 claim thus remains subject to dismissal on the four independent grounds identified in Hermès' prior motion to dismiss:

1.    Plaintiffs do not allege facts showing that Hermès possesses monopoly power. They do not even allege Hermès' share of the claimed luxury handbag market. Their conclusory assertion that Hermès "dominates" the luxury handbag market falls woefully short and is refuted by their other allegations.

2.    Plaintiffs also fail to plead the required element of willful acquisition or maintenance of monopoly power. Instead, they repeat their allegations that Hermès always had, and always will have, iconic products with a loyal following. That accomplishment should be

celebrated—not condemned.  The antitrust laws do not punish companies for creating better, more desirable products.

3.      Plaintiffs do not allege a viable tied product market or effects in such market.  As in their original Complaint, Plaintiffs continue to implausibly group *all* Hermès products (except for three handbags) into a single "Ancillary Products" market consisting of disparate products ranging from jewelry to shoes to perfume to home goods.  This contravenes controlling precedent and flunks basic economics.  Perhaps seeking to hedge their bets, Plaintiffs now also assert that each ancillary product is its own product market—an allegation that is fatally conclusory on its own terms.  But this attempted cure fares no better.  Plaintiffs do not (and cannot) plead substantial effects on competition in each of those supposedly tied markets, either.

4.      Plaintiffs again do not plead antitrust injury because they still allege no facts showing that Hermès has excluded other sellers of the supposedly tied products.  Without well-pleaded allegations that other sellers of jewelry, sellers of shoes, sellers of perfume, sellers of home goods, and so-on, have been excluded from competing, there is no viable tying claim—and there is no harm to the competitive process, the focus of the antitrust laws.

Finally, Plaintiffs' California Cartwright Act claims and their California Unfair Competition Law ("UCL") claim should also be dismissed because Plaintiffs still fail to allege harm to consumers or the competitive process.

Plaintiffs have tried, but failed, to cure their fundamental pleading deficiencies.  These failings cannot be remedied, and this case should be dismissed with prejudice.

## II.      STATEMENT OF ISSUES TO BE DECIDED

1.      Whether the Amended Complaint fails to state a claim under Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

2.      Whether the Amended Complaint fails to state a claim under Sections 16720 and 16727 of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16727.

3.      Whether the Amended Complaint fails to state a claim under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200.

### III.     BACKGROUND

Plaintiffs and the Proposed Class.  On March 19, 2024, Plaintiffs Tina Cavalleri and Mark Glinoga filed an antitrust lawsuit alleging that Hermès of Paris, Inc. and Hermès International (collectively, "Hermès") engaged in a tying scheme in violation of the Sherman Act, the Cartwright Act, and the UCL.  Class Action Complaint, Dkt. 1 ("Compl.").  Hermès filed a motion to dismiss on May 9, 2024.  Dkt 29.  Rather than oppose the motion to dismiss, Plaintiffs filed the First Amended Class Action Complaint on May 30, 2024, Dkt. 33 ("Amended Complaint" or "Am. Compl."), which added Mengyao Yang as a new Plaintiff and included some additional allegations, described below.  Plaintiffs purport to represent a class of U.S. residents (and a subclass of California residents) who "purchased or were asked to purchase Ancillary Products in order to purchase a Birkin Handbag."  Am. Compl. ¶ 44.

Hermès.  According to Plaintiffs, Hermès is a "world-famous designer and producer of high-quality merchandise," such as "luxury handbags, apparel, scarves, jewelry, fashion accessories, and home furnishings."  Id. ¶ 16.[1]  Hermès sells through retail locations in the United States and also maintains a website through which it sells some, but not all of its products.  Id. ¶¶ 19–20.  In the nearly two centuries since it was founded, Hermès has developed a reputation for artisan-crafted luxury products and built a loyal following.  Id. ¶¶ 16–24.

Plaintiffs' Allegations.  This case focuses on two of the many items that Hermès sells: the Birkin and Kelly handbags (defined by Plaintiffs collectively as "Birkin handbag" or "Birkin bag").  Id. ¶ 21.  "Each Birkin handbag is handcrafted from the finest leather by experienced artisans in France."  Id. ¶ 22.  "The manufacturing of a single Birkin handbag requires many hours of an artisan's time," and the "intensive labor and craftsmanship and high-quality leathers required make the Birkin handbag difficult to produce and expensive."  Id.  Because of these supply limitations, Hermès cannot produce sufficient Birkin or Kelly handbags to satisfy demand.  See id. ¶¶ 22–24.

Plaintiffs' lawsuit claims that Hermès unlawfully conditions the purchase of Birkin or

---

[1] Hermès accepts the well-pleaded allegations of fact in the Amended Complaint for purposes of this Motion to Dismiss only.

1   Kelly handbags on purchases of other Hermès products, such as jewelry, scarves, or home goods.

2   In their first Complaint, Plaintiffs alleged that Hermès has market power in the so-called market

3   for "the Birkin Handbag"—a single-brand market they defined to include solely Birkin and Kelly

4   handbags.  Compl. ¶¶ 20, 48.  They claimed that Hermès uses its "economic power" to coerce

5   customers interested in buying a Birkin handbag (the tying product) to purchase unspecified

6   amounts of other Hermès products (the tied product), which Plaintiffs call "Ancillary Products."

7   *Id.* ¶¶ 47, 51.[2]

8       <u>Plaintiffs' New Market Definition.</u>  The Amended Complaint shifts course and redefines

9   the tying market from "the Birkin Handbag," *id.* ¶ 48, to "the market and/or submarket of luxury

10  handbags."  Am. Compl. ¶ 26.  Plaintiffs assert Hermès has market power in this far broader

11  product market, but do not allege Hermès' market share or any approximation thereof.  Plaintiffs

12  admit (as they must) that Hermès competes with "elite designer and luxury brands like Gucci,

13  Prada, and Louis Vuitton," and that Birkin and Kelly handbags are in "low supply" due to the

14  "intensive labor and craftsmanship and high-quality leathers required."  *Id.* ¶¶ 22, 27, 36.  Still,

15  they claim that Hermès' maintains a "significant presence in and dominance of the luxury

16  handbag market," citing Hermès' "strong financial performance in 2023," "singularity," and "the

17  distinctive design of the BIRKIN handbag."  *Id.* ¶¶ 28, 29 (citations omitted).  But Plaintiffs

18  admit the "robust resale value" of the two handbags "exceeds the original purchase price" by a

19  factor of "1.5" to "5 times their original price or more."  *Id.* ¶¶ 34, 35.

20      Plaintiffs claim that Hermès has used its supposed "dominant market position in the

21  luxury handbag market" to "force[] consumers to purchase substantial amounts of Hermès

22  Ancillary Products to 'qualify' for the mere opportunity to buy a Birkin."  *Id.* ¶ 33.  For example,

23  Plaintiff Cavalleri alleges she "has spent tens of thousands of dollars at Hermès" on unspecified

24  products and was allegedly "coerced" into purchasing unspecified Ancillary Products "in order

25  to obtain access to Hermès Birkin bags."  *Id.* ¶ 41.  When she attempted to purchase "another

26  _____

27  [2] Plaintiffs define "*Ancillary Products*" to include "shoes, scarves, belts, jewelry, home goods sold, and other products sold at Hermès' branded retail boutiques, for which Sales Agents

28  receive a commission, but excludes any Birkin, Kelly, or Constance branded handbag."  Am. Compl. ¶ 45.

1  Birkin bag" in 2022, she was allegedly told (by an unidentified person) that "specialty bags are

2  going to 'clients who have been consistent in supporting our business.'"  *Id.*  From this, Cavalleri

3  claims she understood that "she would have to spend more on Ancillary Products to obtain

4  access to another Birkin Handbag." *Id.*  Plaintiffs claim that this practice "inflat[es] the true cost

5  of the[] Birkin handbags" and leads to allegedly "supracompetitive profits." *Id.* ¶ 33.

6       <u>Plaintiffs' New Claims of Injury as Resellers.</u>  Plaintiffs' Amended Complaint reveals the

7  motivation for this lawsuit: the alleged inability to resell Birkin handbags at substantial markup.

8  Specifically, Plaintiffs claim to "have suffered injury . . . by being denied the opportunity to

9  obtain a Birkin bag, which . . . can be resold at a higher price." *Id.* ¶ 43.  Finally, Plaintiffs claim

10  (again without factual foundation or supporting allegations) that Hermès' alleged tying practice

11  "causes economic harm because it reduces competition in the market for the tied products" and

12  Hermès' "competitors in the tied markets cannot make sales for Ancillary Products." *Id.*

13  **IV.   ARGUMENT**

14       To survive dismissal, a complaint "must contain sufficient factual matter" to "'state a

15  claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

16  (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While the court generally

17  accepts as true a complaint's "well-pleaded facts," it does not accept "legal conclusions" or

18  "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678, 679.

19      **A.   Plaintiffs Do Not Plead A Sherman Act Section 2 Tying Claim**

20       To constitute an unlawful tie, there must be at least market power in the tying market

21  (monopoly power is required if the plaintiff alleges a Section 2 claim as these Plaintiffs do) and

22  foreclosure of competitors in the tied market.  That is because "[t]ying arrangements are

23  forbidden on the theory that, if the seller has market power over the tying product, the seller can

24  leverage this market power through tying arrangements to exclude other sellers of the tied

25  product." *Rick-Mik*, 532 F.3d at 971 (citation omitted).  "The traditional antitrust concern with

26  such an agreement is that if the seller of the tying product is a monopolist, the tie-in will force

27  anyone who wants the monopolized product to buy the tied product from him as well, and the

28  result will be a second monopoly." *Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 592 (7th

Cir. 2008) (Posner, J.).  Thus, a tying claim requires anticompetitive harm in the form of "reduced competition in the market for *the tied product*."  *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1089 (9th Cir. 2009) (emphasis added) (citation omitted).  Conversely, tying that does not foreclose rivals in the tied market will not harm competition and, thus, is lawful.  *See id.*

The required elements of a tying claim are difficult to establish.  *Rick-Mik*, 532 F.3d at 971 & n.2.  A plaintiff must show not only that the defendant has tied together two economically distinct products, but also "that the defendant has market power in the tying product."  *Id.* at 971 (citation omitted).  Here, Plaintiffs face an especially heavy burden because they bring their tying claim under Section 2 of the Sherman Act.  Am. Compl. ¶¶ 54–62.  Section 2 claims require "the possession of *monopoly* power in the relevant market" and "[m]onopoly power differs in degree from market power, requiring 'something greater.'"  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (emphasis added) (citation omitted), *cert. denied*, 144 S. Ct. 681 (2024).  Courts ordinarily require upwards of 60 percent market share to infer monopoly power, and "a market share of less than 50 percent is presumptively insufficient."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995).

Plaintiffs do not sufficiently allege market power—let alone monopoly power—and they do not allege the willful acquisition or maintenance of such power, either of which dooms their Section 2 tying claim.  Plaintiffs' Section 2 tying claim fails for the additional reasons that Plaintiffs have not pleaded effects in any viable tied product market or antitrust standing.

### 1.    The Amended Complaint Does Not Allege That Hermès Has Market Or Monopoly Power In The Alleged Luxury Handbag Market

Despite being on notice from Hermès' prior motion to dismiss, Plaintiffs' Amended Complaint still fails to allege any facts establishing market or monopoly power—indeed, its new allegations *undercut* any claim that Hermès has market power, let alone monopoly power.

"Market power is the ability to raise prices profitably *by restricting output*," *Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018) (citation omitted), and it can be shown either directly or circumstantially.  *Rebel Oil Co.*, 51 F.3d at 1434.  The Ninth Circuit has made clear that direct evidence of market power requires a showing that a firm can, "by restricting its own output . . .

1   [thereby] restrict marketwide output and, hence, increase marketwide prices." *Id.*; *Forsyth v.*

2   *Humana, Inc.*, 114 F.3d 1467, 1475–76 (9th Cir. 1997) (holding that with "no accompanying

3   showing of restricted output," plaintiffs' evidence that "Sunrise Hospital routinely charged

4   higher prices than other hospitals while reaping high profits" was not "direct evidence of market

5   power"), *aff'd*, 525 U.S. 299 (1999), *overruled on other grounds by Lacey v. Maricopa Cnty.*,

6   693 F.3d 896 (9th Cir. 2012).   To allege market power circumstantially, the plaintiff must:

7   "(1) define the relevant market, (2) show that the defendant owns a dominant share of that

8   market, and (3) show that there are significant barriers to entry and show that existing

9   competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51 F.3d at

10  1434; *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018)

11  (applying *Rebel Oil* to motion to dismiss).  The "starting point" is to plead nonconclusory facts

12  showing a dominant "market share." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d

13  919, 925 (9th Cir. 1980); *Hip Hop*, 733 F. App'x at 382.  A share of "30 percent [or less] is

14  presumptively insufficient to establish" market power and "less than 50 percent is presumptively

15  insufficient" to establish monopoly power in an actual monopolization case. *Rebel Oil*, 51 F.3d

16  at 1438.

17      *First*, Plaintiffs do not plead any direct evidence.  They do not allege that Hermès is

18  artificially suppressing marketwide output or that it is charging supracompetitive prices for

19  Birkin handbags.  To the contrary, their new allegations admit that Birkin handbags are priced

20  *below* the prices at which they could be sold. *See, e.g.*, Am. Compl. ¶ 35 ("standard leather"

21  Birkin handbags resell for "1.5 to 3 times [their] original retail price").  Plaintiffs' conclusory

22  allegation that the alleged tying arrangement results in "supracompetitive prices" for the

23  combined package of Birkin handbags and Ancillary Products, *id.* ¶ 32, omits the requisite facts,

24  such as the total price and a comparison of that price to the competitive market price.  Courts

25  routinely reject similar allegations. *See, e.g.*, *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, No.

26  21-cv-00540, 2022 WL 2791201, at *7–8 (E.D. Cal. July 15, 2022) (dismissing complaint given

27  failure to "identify supracompetitive prices"); *Intel Corp. v. Fortress Inv. Grp.*, 511 F. Supp. 3d

28

1   1006, 1029 (N.D. Cal. 2021) (conclusory allegation of supracompetitive pricing insufficient),

2   *aff'd*, No. 21-16817, 2022 WL 16756365 (9th Cir. Nov. 8, 2022).

3        *Second*, Plaintiffs fail to plead indirect evidence of market or monopoly power.  The

4   Amended Complaint identifies a new "luxury handbag market," but says *nothing* about Hermès'

5   market share in that purported market.  As market share is the "starting point for assessing

6   market power," *Hunt-Wesson*, 627 F.2d at 925, this failure forecloses their claim.  *See Hip Hop*,

7   733 F. App'x at 382 (affirming dismissal of complaint alleging defendant "controlled a 'major

8   percent' of the energy-drink market" without further detail); *Dominick v. Collectors Universe,*

9   *Inc.*, No. 12-cv-04782, 2012 WL 4513548, at *7 (C.D. Cal. Oct. 1, 2012) (dismissing claim for

10  failure to "allege specific facts demonstrating that [d]efendants control a substantial share of the

11  market" given absence of comparison to competitors).

12       Plaintiffs' other threadbare conclusions concerning supposed market dominance do not

13  make up for this failure.  Plaintiffs claim Hermès has a "significant presence in and dominance

14  of the luxury handbag market" because it (a) "reported strong financial performance in 2023"

15  and (b) experienced "significant growth in [its] leather goods and saddlery division (which

16  includes handbags)," despite broader challenges in the luxury industry.  Am. Compl. ¶ 28.  These

17  generalized allegations of success—divorced from any actual comparison to competitors in the

18  relevant market—do not come close to a plausible allegation that Hermès dominates the claimed

19  luxury handbag market.  *See Twombly*, 550 U.S. at 555; *Hip Hop*, 733 F. App'x at 382.

20       Plaintiffs' other allegations fatally undermine any inference of market or monopoly

21  power.  For one, Plaintiffs admit Hermès competes with other "elite designer and luxury brands

22  like Gucci, Prada, and Louis Vuitton."  Am. Compl. ¶ 27.  Yet Plaintiffs offer no allegations of

23  Hermès' or these other "like" brands' relative market positions in the "luxury handbag market"

24  as a whole.  *Id.*  Plaintiffs' allegations that Birkin handbags are in "limited production" and "low

25  supply," *id.* ¶¶ 26, 36, further undercut their assertion of market power.  If Hermès' sales of

26  Birkin handbags are as limited as Plaintiffs allege, then there is no chance that Hermès has a

27  significant share of the claimed luxury handbag market.  The last nail in the coffin is Plaintiffs'

28  pricing assertion: Hermès is alleged to sell its Birkin handbags at retail prices "1.5 to . . . 5

times" below the resale price. *Id.* ¶ 35. This is the opposite of supracompetitive pricing.[3]

Plaintiffs are ultimately left with their allegation that Birkin handbags are "unique" and "exclusive," and this supposed "lack of substitutes reduces price elasticity." *Id.* ¶¶ 21, 27, 31. But even that allegation is not supported by any factual allegations that the Birkin handbags' desirability relative to other brands gives Hermès the power over price in a luxury handbag market generally. Regardless, the Supreme Court has emphasized that "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Illinois Tool*, 547 U.S. at 46. And the Supreme Court has repudiated any presumption of market power based on unique product characteristics, including patents. *Id.* at 45–46; *see Rick-Mik*, 532 F.3d at 971 n.2. Now that Plaintiffs have conceded that Birkin handbags are not their own product market, and the market is instead a far larger alleged market for luxury handbags, they cannot plead market power (and certainly not monopoly power) based solely on generalized allegations about the Birkin's desirability.

### 2. Plaintiffs Do Not Plead Willful Maintenance Or Acquisition Of Monopoly Power As Required By Section 2

Plaintiffs' Section 2 claim suffers from an additional flaw: Plaintiffs come nowhere close to alleging the willful maintenance or acquisition of monopoly power. *See Epic Games*, 67 F.4th at 998. Section 2 claims require (1) "the possession of monopoly power in the relevant market" and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* (citation omitted). As noted, Plaintiffs fail to allege that Hermès has monopoly power in any well-defined market. But they also fail the second prong because they plead *no* facts showing that Hermès willfully acquired or maintained a monopoly through anticompetitive conduct.

---

[3] Plaintiffs' suggestion that the total price of the Birkin handbag, accounting for the purchase of Ancillary Products, is supracompetitive, Am. Compl. ¶ 32, misunderstands basic economics. Plaintiffs' theory would require Hermès to sell its "Ancillary Products" *far* above their competitive market price. But Hermès is not alleged to—and undisputedly does not—have market power over any of the Ancillary Products, and so marking up those items would be economically irrational and mean losing a substantial share of customers to competitors.

1    Plaintiffs certainly include conclusory allegations that Hermès is dominant—but under

2  the allegations in the Amended Complaint, that supposedly resulted from the combination of:

3  (1) the success of Hermès' brand; and (2) the Birkin handbag's reputation as a result of "[t]he

4  intensive labor and craftmanship and high-quality leathers" required.  Am. Compl. ¶¶ 21–29.

5  None of this conduct is remotely anticompetitive, and Plaintiffs do not allege otherwise.  *See*

6  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and*

7  *Their Application* ¶ 781 (May 2024, online) ("[P]roduct superiority is one of the objectives of

8  competition and cannot be wrongful, even for a monopolist.").  Indeed, Plaintiffs concede that

9  Hermès' "intensive labor and craftsmanship and high-quality leathers" are what make the Birkin

10  handbag "expensive" in the first place.  Am. Compl. ¶ 22.

11  **3.    The Amended Complaint Does Not Define A Viable Tied Product**

12  **Market In Which Competitive Effects Can Be Assessed**

13    Plaintiffs' Sherman Act claim fails for the independent reason that Plaintiffs do not

14  define a viable *tied* product market or *effects* in any viable tied product market.  To state a valid

15  tying claim, Plaintiffs must properly define the *tied* product market.  *See, e.g.*, *Teradata Corp. v.*

16  *SAP SE*, 570 F. Supp. 3d 810, 851 (N.D. Cal. 2021); *accord Truck-Rail Handling, Inc. v.*

17  *Burlington N. & Santa Fe Ry. Co.*, 244 F. App'x 130, 131–32 (9th Cir. 2007).  This is a critical

18  step because the harm that tying law seeks to prevent is foreclosure of competition *in the tied*

19  *market.  See supra* at 5–6.  Absent a properly defined tied market, courts cannot determine

20  whether the plaintiff has properly shown that the tying arrangement affects a "not insubstantial

21  volume of commerce in the tied product market."  *Rick-Mik*, 532 F.3d at 971 (citation omitted).

22    Here, Plaintiffs' definition of the tied product market is facially unsustainable.  The

23  original Complaint grouped together all "Ancillary Products" into a single market, from "home

24  furnishings" to "jewelry" to "apparel" to "fashion accessories" and more.  Compl. ¶¶ 15, 35, 47.

25  That theory defied "[t]he principle most fundamental to product market definition": "cross-

26  elasticity of demand for certain products or services," *i.e.*, "the extent to which consumers view

27  two 'products [as] be[ing] reasonably interchangeable' or substitutable for one another."

28  *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023) (citations omitted), *cert.*

1    *denied*, No. 23-1089 (U.S. May 13, 2024).  Plaintiffs offered no explanation for how goods as

2    diverse as home furnishings and jewelry could be reasonable substitutes—and no such

3    explanation would be economically plausible.  Hermès faces different competitors depending on

4    the product; for jewelry, it may face one kind of competitive pressure, while the pressure it faces

5    for home furnishings is completely different.  Plaintiffs' contrived effort to create a single market

6    from of an array of distinct products fails as a matter of law.

7         Plaintiffs' Amended Complaint is muddled and appears to repeat this same error.  *See,*

8    *e.g.*, Am. Compl. ¶¶ 43, 58, 69, 78 (referring to the "market for the tied products" and defining

9    tied market as "Ancillary Products" as a whole).  At two points, however, Plaintiffs now also

10   appear to allege that *each category* of Ancillary Products constitutes its own separate tied

11   market.  They state that "[t]he tied products include designer shoes, scarves, belts, clothing,

12   jewelry, and home goods sold by Hermès," and "[t]here is a market for *each* of these tied

13   products." *Id.* ¶ 36 (emphasis added); *see id.* ¶ 43.  That doesn't work, either.  For starters, these

14   so-called market definitions are fatally conclusory.  There is no discussion of the markets'

15   scope—whether they are purportedly limited to "luxury" items or encompass all similar goods;

16   and what kinds of goods fit into each market in the first place.  Further, these are plainly just a

17   sampling, because elsewhere Plaintiffs claim that practically *all* Hermès products (other than the

18   Birkin, Kelly, or Constance branded handbag) qualify as "*Ancillary Products*." *Id.* ¶ 45.

19        But even if Plaintiffs could redefine the tied market from Ancillary Products to numerous

20   separate markets for every single other product that Hermès sells, this would create another

21   problem: Plaintiffs have not alleged substantial effects in *each* of these supposedly tied markets.

22   As noted above, tying law seeks to prevent the foreclosure of competitors in the tied market.

23   Plaintiffs must allege "a total amount of business, substantial enough in terms of dollar-volume

24   so as not to be merely de minimis, is foreclosed to competitors by the tie [in the tied product's

25   market]." *In re Qualcomm Antitrust Litig.*, No. 17-md-02773, 2023 WL 121983, at *16 (N.D.

26   Cal. Jan. 6, 2023) (applying Cartwright Act) (alteration in original) (citation omitted).  Plaintiffs'

27   Amended Complaint defaults on this requirement.  Plaintiffs raise only the conclusory

28   allegations that "Defendants' unlawful practice . . . causes economic harm because it reduces

competition in the market for the tied products" and "Defendants' competitors in the tied markets cannot make sales for Ancillary Products that are purchased as a result of the coercive effect of Defendants' tying practice."  Am. Compl. ¶ 43.  These conclusory statements do not satisfy Plaintiffs' burden of pleading substantial effects on competition in each supposedly tied market. *See In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 995 (N.D. Cal. 2010) (dismissing claim because plaintiffs failed to "plead 'a pernicious effect on competition'" and "reduced competition in the market for the tied product" (citations omitted)).

There are no factual allegations that competitors in the sale of jewelry or home goods or shoes or even "Ancillary Products" are foreclosed.  The Amended Complaint fails.

### 4.      Plaintiffs Do Not Plead Facts Showing Antitrust Standing

Plaintiffs' Amended Complaint does not allege the required antitrust standing because they do not allege an "antitrust injury."  *See Somers v. Apple, Inc.*, 729 F.3d 953, 963–64 & n.5 (9th Cir. 2013).  The defendant's unlawful conduct must have caused an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Id.* at 963 (citation omitted).  Plaintiffs must, but fail, to allege "specific facts" of *harm to competition* in the market.  *Id.* at 965.

For a tying claim, antitrust injury means harm to "competition in the market for the tied product"—namely, the foreclosure of rivals, to the detriment of consumers.  *See Rick-Mik*, 532 F.3d at 971; *accord Blough*, 574 F.3d at 1089.  Here, Plaintiffs claim "Defendants' competitors in the tied markets cannot make sales for Ancillary Products that are purchased as a result of the coercive effect of Defendants' tying practice," Am. Compl. ¶ 43, but they allege *no facts* to support this legal conclusion.  Because they do not sufficiently "sketch the outline of [the injury to competition] with 'allegations of supporting factual detail," *Netafim*, 2022 WL 2791201, at *12 (alteration in original), Plaintiffs' claim should be dismissed.

Instead, Plaintiffs raise a compendium of meritless theories of harm: (1) Plaintiffs are "left with Hermès Ancillary Products that they never would have purchased but for their desire to acquire a Birkin bag" (Am. Compl. ¶ 33); (2) Plaintiffs have been denied "the opportunity to obtain a Birkin bag" to "be resold at a higher price" (*id.* ¶ 43); (3) the total price of the Birkin

1    handbag and Ancillary Products is "supracompetitive" (*id.* ¶ 33); and (4) Plaintiffs are unable to

2    "choose among" luxury items "independently from their decision to purchase Birkin handbags"

3    (*id.* ¶¶ 60, 71, 80).  None of these constitutes an antitrust injury under controlling case law.

4         As to the first theory, "*[z]ero foreclosure exists where the tied product is completely*

5    *unwanted by the buyer.*" *Blough*, 574 F.3d at 1089.  For "[w]hen a purchaser is 'forced' to buy a

6    product he would not have otherwise bought even from another seller in the tied product market,

7    there can be no adverse impact on competition because no portion of the market which would

8    otherwise have been available to other sellers has been foreclosed." *Id.* (citation omitted).

9         The second theory is even less successful.  Plaintiffs have no right to purchase Hermès

10   products on demand for purposes of resale on the secondary market.  After all, businesses are

11   ordinarily entitled to exercise their "own independent discretion as to parties with whom [they]

12   will deal." *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408

13   (2004) (citation omitted).  And "[c]ompelling such firms to share the source of their advantage is

14   in some tension with the underlying purpose of antitrust law." *Id.* at 407–08.

15        Third, "'merely enhancing the price of the tying product' . . . does not" harm competition.

16   *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199, 1202 (9th Cir. 2012) (citation omitted).

17   This makes sense because, again, the injury is not any increase in price of the tying product (for

18   which the defendant is alleged to have market power regardless of the tie), but "reduced

19   competition in the market for *the tied product*." *Rick-Mik*, 532 F.3d at 971 (emphasis added).

20   And Plaintiffs allege no facts showing that the total price was supracompetitive.  *See supra* at 7.

21        Finally, as to the fourth, a tie's "effect of reducing consumers' choices" for which

22   products to purchase "does not sufficiently allege an injury to competition" because it is "fully

23   consistent with a free, competitive market." *Brantley*, 675 F.3d at 1202.

24        At bottom, antitrust law requires Plaintiffs to allege not just harm to themselves, but harm

25   to the competitive process, and they utterly fail to do so.  This deficiency is predictable because

26   there is no plausible case that Hermès has harmed competition.  The Ancillary Products Plaintiffs

27   claim to be forced to buy in order to obtain a Birkin handbag are independently desirable items—

28   and there are no plausible allegations of harm to competition resulting from the alleged tie.

1

    **B.**      **Plaintiffs' State Law Claims Also Fail**

2

        **1.**      **Plaintiffs Do Not State A Tying Claim Under The Cartwright Act**

3

      Plaintiffs' failure to plead market or monopoly power in a tying product market,

4

substantial effects in a viable tied product market, or antitrust injury likewise dooms their two

5

Cartwright Act claims.  Section 16720 of the Cartwright Act requires that: "(1) a tying

6

agreement, arrangement or condition existed whereby the sale of the tying product was linked to

7

the sale of the tied product or service; (2) the party had sufficient economic power in the tying

8

market to coerce the purchase of the tied product; (3) a substantial amount of sale was affected in

9

the tied product; and (4) the complaining party sustained pecuniary loss as a consequence of the

10

unlawful act."  *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 541–42 (Cal. Ct. App. 1998)

11

(citation omitted).  Section 16727 requires "*either* element (2) or (3) . . . along with elements (1)

12

and (4)."  *Id.*  "[I]n the absence of evidence of some tied market foreclosure or anticompetitive

13

impact in the tied product market, the plaintiff cannot establish an unlawful tying claim."  *Belton*

14

*v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1234 (Cal. Ct. App. 2007).  A

15

Cartwright Act claim also requires proof of antitrust injury.  *See Ahn v. Stewart Title Guar. Co.*,

16

93 Cal. App. 5th 168, 178–81 (Cal. Ct. App. 2023).  As noted above, Plaintiffs fail to plead

17

market power, anticompetitive effects in a viable tied product market, or antitrust injury, which

18

dooms their Cartwright Act claims as well.

19

        **2.**      **Plaintiffs Do Not State A Claim Under The UCL**

20

      Plaintiffs allege that the same conduct that violates the Sherman Act and the Cartwright

21

Act violates the "unlawful" prong of the UCL.  *See* Am. Compl. ¶ 87; Cal. Bus. & Prof. Code

22

§ 17200.  This "unlawful" prong claim "borrows" violations of other laws, treating them as

23

unlawful practices separately actionable under the UCL.  *Farmers Ins. Exch. v. Super. Ct.*, 2 Cal.

24

4th 377, 383, 826 P.2d 730, 734 (Cal. 1992).  Because the Sherman and Cartwright Act claims

25

fail, their unlawful prong UCL claim must be dismissed too.

26

      Plaintiffs' Amended Complaint now also seeks relief under the UCL's "unfairness"

27

prong.  Am. Compl. ¶¶ 88–90.  Courts applying this prong have used two different tests, but

28

Plaintiffs' allegations fall fatally short under both.  Under the "tethering" test, courts determine

1    "whether the defendant's conduct 'threatens an incipient violation of an antitrust law, or violates

2    the policy or spirit of one of those laws because its effects are comparable to or the same as a

3    violation of the law, or otherwise significantly threatens or harms competition.'" *Epic Games*,

4    67 F.4th at 1000 (citation omitted).  Under the "balancing" test, courts "weigh the utility of the

5    defendant's conduct against the gravity of the harm to the alleged victim." *Id.* (citation omitted).

6         Neither saves Plaintiffs' case.  As the California Court of Appeal held in *Belton*: "[i]n the

7    absence of some restraint upon competition, the mere practice of packaging services together

8    [*i.e.*, tying] is not inherently anticompetitive or harmful to consumers."  151 Cal. App. 4th at

9    1240 (citations omitted).  So Plaintiffs must allege something more than the tying of products to

10   show an "incipient violation" or comparable harm to consumers.  *See id.*  Plaintiffs have not

11   done so, and instead invoke the same theories that failed under the Sherman and Cartwright Acts.

12   *See supra* at 6–14.[4]  Nor have Plaintiffs plausibly alleged any other form of consumer harm, such

13   as "decrease[d] [consumer] information."  *Compare Epic Games*, 67 F.4th at 1001.

14        Ultimately, Plaintiffs' Amended Complaint reveals what this case is about: obtaining on-

15   demand access to Birkin handbags so Plaintiffs can resell them for a significant mark-up on the

16   secondary market.  But "individualized harm" of this sort "does not support a claim for violation

17   of the UCL," because it does not affect consumers in the marketplace as a whole.  *Marsh v.*

18   *Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 501 (Cal. Ct. App. 2011).  And

19   Hermès is under no duty to sell Plaintiffs Hermès' products under Plaintiffs' preferred terms.

20   *See, e.g.*, *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 372–76 (Cal. Ct. App. 2001).

21   **V.    CONCLUSION**

22        Plaintiffs' implausible and internally inconsistent Amended Complaint should be

23   dismissed with prejudice.

24

25   [4] *See, e.g.*, *Belton*, 151 Cal. App. 4th at 1240 ("If the same conduct is alleged to be both an
     antitrust violation and an 'unfair' business act or practice for the same reason—because it
26   unreasonably restrains competition and harms consumers—the determination that the conduct is
     not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward
27   consumers.  To permit a separate inquiry into essentially the same question under the unfair
     competition law would only invite conflict and uncertainty and could lead to the enjoining of
28   procompetitive conduct." (citation omitted)).

1     Dated:  July 2, 2024

                          Respectfully submitted,

2

                          LATHAM & WATKINS LLP

3

4                          By      */s/ Christopher S. Yates*
                               Christopher S. Yates

5                              Belinda S Lee
                             Ashley M. Bauer

6                              505 Montgomery Street, Suite 2000
                             San Francisco, CA  94111-6538

7                              Telephone:  415.391.0600
                             Facsimile:  415.395.8095

8                              Email:  Chris.Yates@lw.com
                                   Belinda.Lee@lw.com

9                                    Ashley.Bauer@lw.com

10                           Peter E. Davis
                          555 Eleventh Street, NW, Suite 1000

11                           Washington, DC  20004-1304
                          Telephone:  202.637.2200

12                           Facsimile:  202.637.2201
                          Email:  Peter.Davis@lw.com

13                           Attorneys for Defendants
                          *Hermès of Paris, Inc. and*

14                           *Hermès International*

15

16

17

18

19

20

21

22

23

24

25

26

27

28