Joshua H. Haffner, SBN 188652
 jhh@haffnerlawyers.com
Alfredo Torrijos, SBN 222458
 at@haffnerlawyers.com
Vahan Mikayelyan, SBN 337023
 vh@haffnerlawyers.com
**HAFFNER LAW PC**
15260 Ventura Blvd., Suite 1520
Sherman Oaks, California 91403
Tel: (213) 514-5681 / Fax: (213) 514-5682

Shaun C. Setareh, SBN 204514
 shaun@setarehlaw.com
Thomas A. Segal, SBN 222791
 thomas@setarehlaw.com
**SETAREH LAW GROUP**
420 N. Camden Drive., Suite 100
Beverly Hills, California 90210
Tel: (310) 888-7771 / Fax: (310) 888-0109

Attorneys for Plaintiffs
and the Proposed Class

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

TINA CAVALLERI, an individual; MARK GLINOGA, an individual; MENGYAO YANG, an individual; on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

HERMÈS INTERNATIONAL, a French corporation and HERMÈS OF PARIS, INC., a New York corporation, and DOES 1 through 10; inclusive,

Defendants.

Case No.  3:24-cv-01707-JD

HON. JAMES DONATO

**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**

1. **VIOLATION OF SHERMAN ACT (15 U.S.C. § );**
2. **VIOLATION OF SHERMAN ACT (15 U.S.C. §2);**
3. **VIOLATION OF CARTWRIGHT ACT (BUS. & PROF. CODE, § 16720);**
4. **VIOLATION OF CARTWRIGHT ACT (BUS. & PROF. CODE, § 16727);**
5. **VIOLATION OF UNFAIR COMPETITION LAW (BUS. & PROF. CODE, §§ 17200, ET SEQ);**

6. **VIOLATION OF FALSE ADVERTISING LAW (BUS. & PROF. CODE §§ 17500, ET SEQ.);**

7. **COMMON LAW FRAUD; AND**

8. **NEGLIGENT MISREPRESENTATION.**

**JURY TRIAL DEMANDED**

Plaintiffs Tina Cavalleri, Mark Glinoga, and Mengyao Yang (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege upon personal knowledge as to their own acts and upon information and belief (based on the investigation of counsel), as follows:

## NATURE OF ACTION

1.      This is an antitrust, unfair business practices, false advertising, fraud and misrepresentation class action arising out of Defendants Hermès International and Hermès of Paris, Inc. ("Defendants" or "Hermès") unlawful practice of tying the purchase of Defendants' popular Birkin bags to the purchase of other Defendants' luxury clothing and accessory items.  As set forth herein, Defendants' practices are unlawful.  In this action, Plaintiffs seek compensatory and punitive damages and appropriate injunctive relief on behalf of themselves and all others similarly situated.

## PARTIES

2.      Plaintiff Tina Cavalleri ("Plaintiff Cavalleri") is a resident of California.

3.      Plaintiff Mark Glinoga ("Plaintiff Glinoga") is a resident of California.

4.      Plaintiff Mengyao Yang ("Plaintiff Yang") is a resident of California.

5.      Defendant Hermès International ("Hermès International") is a corporation, organized and existing under the laws of France, having its principal place of business located in Paris, France.  Hermès International does business in the United States, including New York, through its wholly-owned subsidiary Hermès of Paris, Inc.

6.      Defendant Hermès of Paris, Inc. ("Hermès of Paris") is a corporation, organized and

existing under the laws of New York, having its principal place of business located at 55 East 59th Street, New York, New York 10022.  Hermès of Paris, Inc. is the sole authorized distributor of the Birkin handbags in the United States and has the exclusive right to sell Birkin handbags under the Hermès trademark in the United States.

7.     Hermès International and Hermès of Paris are collectively referenced herein as Hermès.

8.     The true names and capacities, whether individual, corporate, partnership, associate or otherwise of defendants Does 1 through 10, inclusive, are unknown to Plaintiffs, who therefore sue these defendants by such fictitious names.  Plaintiffs will seek leave to amend this complaint to allege the true names and capacities of Does 1 through 10, inclusive, when they are ascertained.

9.     Plaintiffs are informed and believe, and based upon that information and belief allege, that the Defendants named in this complaint, including Does 1 through 10, inclusive, are responsible in some manner for one or more of the events and happenings that proximately caused the injuries and damages alleged herein.

10.     Plaintiffs are informed and believe, and based upon that information and belief allege, that each of the Defendants, including Does 1 through 10, inclusive, in performing or omitting to perform the acts alleged were, at various times, acting within the course and scope of his or her employment, authority, or apparent authority as an employee, agent and/or representative of the other Defendants.  Plaintiffs are further informed and believe, and based upon that information and belief allege, that at various other times the Defendants, in performing or omitting to perform the acts alleged hereinafter, acted outside the course and scope of their employment, authority, or apparent authority, did not utilize or operate through any corporations or businesses, and were not engaged in any business activities whatsoever, but rather, were acting outside the realm of any business individually and are thus liable for all damages alleged herein, jointly and severally.

11.     Plaintiffs are informed and believe, and based upon that information and belief allege, that each Defendant named in this complaint, including Does 1 through 10, inclusive, knowingly and willfully acted in concert, conspired and agreed together among themselves, and

— 3 —

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

entered into a combination and systemized campaign of activity, to inter alia damage Plaintiffs and the Class and to otherwise consciously and/or recklessly act in derogation of the rights of Plaintiffs and the Class, and the trust reposed by Plaintiffs and the Class in each of the Defendants, the acts being negligently and/or intentionally inflicted. This conspiracy, and Defendants' concerted actions, were such that, to the information and belief of Plaintiffs and the Class, and to all appearances, Defendants, represented a unified body so that the actions of one Defendant were accomplished in concert with, and with knowledge, ratification, authorization and approval of each of the other Defendants.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises under the Sherman Act, 15 U.S.C. § 2.

13.     This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as those that give rise to the federal claims.

14.     This Court has personal jurisdiction over Defendants because they conduct business in California and have sufficient minimum contacts with California. Defendants also advertise and solicit business in California.

15.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District: Defendants gain significant revenue and profits from doing business in this District, Class Members affected by the practices asserted herein reside in this District, and Defendants employ numerous people in this District. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this District. Defendants' conduct had the intended and foreseeable effect of causing injury to persons residing in this District.

## FACTUAL ALLEGATIONS

### A.     Hermès.

16.     Hermès is a world-famous designer and producer of high-quality merchandise

— 4 —

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

including, *inter alia*, luxury handbags, apparel, scarves, jewelry, fashion accessories, and home furnishings.

17.     For decades, Hermès has developed its reputation and distinctive image.

18.     Hermès' origins date back to 1837, when it began designing and manufacturing high quality harnesses for horses.  During the twentieth century, Hermès expanded its business to include handbags, personal leather goods, and apparel.

19.     Hermès is the exclusive distributor or licensor in the United States of its merchandise.

20.     Hermès sells its products directly to consumers through Hermès-owned retail stores and (except for Birkin handbags) through its website at www.hermes.com.  Hermès currently operates approximately 43 retail stores in the United States with 8 of those retail stores located in California.

**B.     The Birkin Handbag.**

21.     Hermès is well known for its famous Birkin and Kelly handbags (collectively "Birkin handbag" or "Birkin bag"), which are exclusive Hermès designs.  Defendants are the exclusive distributors of the Birkin bag in the United States.

22.     Each Birkin handbag is handcrafted from the finest leather by experienced artisans in France.  The manufacturing of a single Birkin handbag requires many hours of an artisan's time.  The intensive labor and craftsmanship and high-quality leathers required make the Birkin handbag difficult to produce and expensive.  The price of a Birkin handbag ranges from thousands of dollars to over one hundred thousand dollars.

23.     "The desirability of an Hermès Birkin handbag – a symbol of rarefied wealth – is such that not even a global pandemic can dull demand for it."  In the second quarter of 2021, Hermès' sales for the leather and saddlery division, which includes the Birkin handbags, more than doubled from a year ago and rose by 24% from their pre-pandemic June 2019 levels.

24.     Despite the price and exclusivity, the Birkin handbag has become a household name and well known by the general public, both in name and by its distinctive design.

25.     The Birkin handbag is an icon of fashion, and the primary product associated with

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

Hermès.  A September 2021 Vanity Fair article noted "There is a kind of fashion object so long lasting, so tirelessly wanted that its name becomes recognizable, a metonym for the brand that made it: the Air Jordan, the Love bracelet.  Few brands, successful though they may be, attain that kind of saturation."

## THE RELEVANT TYING MARKET

26.     The relevant market at issue is the market and/or submarket of elitist luxury handbags in the United States, within which Defendants, through their Birkin handbags, exercise substantial market power.  Defendants' iconic Birkin bag, limited production, and high demand contribute to their dominant position in this market.  Defendants' dominant position in this market, characterized by high barriers to entry and brand recognition, allows them to control prices and engage in the anti-competitive conduct alleged herein to the detriment of consumers.

27.     Industry experts have recognized that luxury goods, including handbags, fall into three tiers, "elitist", "aspirational" and "accessible." Bernstein Research (a company providing research for institutional investors) has stated that the "elitist" tier includes Hermes, Chanel, and Bottega Veneta, the "aspirational tier" includes Louis Vuitton, Gucci, Prada, and Ferragamo, and the "accessible tier" includes Burberry, Coach, Ralph Lauren, and Calvin Klein. Bernstein Research, Black Book, July 2010, "European Luxury Goods: The Anatomy of Overseas Luxury Markets."

28.     A 2014 academic article coauthored by Tasha Lewis (Assistant Professor of Fiber Science and Apparel Design at Cornell University) and Brittany Haas (Hermes of Paris USA Merchandising Manager) explains that: "Recent studies of luxury consumption by U.S. consumers also suggest a stratification of luxury categories that aligns with the segmentation of accessible, aspirational and elitist luxury (Mintel 2011). Three groups that emerged from the research included *Exclusives, Taggers,* and *Treaters.* The Exclusives Segment had a perspective of luxury that most aligned with features of the Hermès brand, which included a definition of luxury as 'brands with a longstanding history of exclusivity and prestige', a greater tendency to associate luxury goods with craftsmanship and premium materials, and avoidance of obvious designer logos or patterns (Mintel 2011)." Global Fashion Brands: Style, Luxury & History, Lewis and Hass,

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

Managing an iconic old luxury brand in a new luxury economy: Hermes handbags in the US market." GFB p. 172, Intellect Limited 2014.

29.     The same article explains that: "Accessible luxury brands in the United States include American brands like Ralph Lauren, Tommy Hilfiger, Michael Kors, and most importantly, Coach – a major player in the handbag market. It has been estimated that close to 80% of the US luxury apparel market is actually comprised of accessible (new) luxury, 16% of the market is categorized as 'aspirational' luxury (Louis Vuitton, Gucci) and a modest 3% as 'elitist' luxury, which includes Hermès and Chanel (Bernstein Research 2010)." *Id.* at 171.

30.     The elitist luxury handbag market is characterized by high price points, superior craftsmanship and materials, and investment potential.  The Birkin bag's exclusivity, limited availability, and iconic status make it difficult to find a perfect substitute.  While the Birkin bag occupies a distinct and exclusive niche within the luxury handbag market, a limited number of handbags may be considered potential substitutes for cross-elasticity purposes.  This limited substitutability reinforces the Birkin bag's market power and enables Defendants to engage in anti-competitive practices.

31.     The fact that consumers in the elitist luxury handbag market do not view other handbags as substitutes for the Birkin is illustrated by the fact that on the resale market for handbags, 73% of secondhand handbags listed at a price point of over $20,000 are Hermes handbags. This data is based on 4304 listings from www.farfetch.com under the category "Designer Bags & Purses for Women."

**HERMES' MARKET POWER IN THE ELITIST LUXURY HANDBAG MARKET**

32.     Based on publicly available data, Hermès' Birkin bags constitute between 60% and 75% of the Elitist Luxury Handbag Market.

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

a.     Hermès reported strong financial performance in 2023, with significant growth in their leather goods and saddlery division (which includes handbags).[1] This suggests a healthy market share and continued demand for their products.

b.     Publications like LUXlife Magazine[2] and PurseBop[3] highlighted Hermès' success in 2023, particularly with the Birkin bag, despite challenges faced by the broader luxury market.  This further emphasizes their strong position.

33.     Defendants have made the following statements and admissions related to the relevant market and its market power:

a.   In a January 9, 2023, press release Defendants stated it has "forge[d] the singularity of Hermès . . ."

b.   On February 9, 2024, Axel Dumas, Executive Chairman of Hermes, said: "In 2023, Hermes has once again cultivated its singularity" and said "[t]hanks to its unique business model."

c.   In its 2023 Universal Registration Document, Defendants stated "Hermes holds a unique position in the luxury market."

d.   In a March 2024 letter to shareholders, Hermes stated it has "continued to consolidate its position as one of the highest-performing companies in the Luxury Products and Cosmetics sector in the MSCI ESG, Moody's ESG, and Sustainalytics ratings."

e.   In a complaint Defendants filed in an action entitled *Hermes International v. Mason Rothschild*, USDC, Southern District of New York, filed 1/14/22, Defendants sued for infringement of "the distinctive design of the BIRKIN handbag," and alleged that:

---

[1]   https://assets-finance.hermes.com/s3fs-public/node/pdf_file/2024-02/1707422069/hermes_20240209_pr_2023fullyearresults_va.pdf

[2]   https://www.lux-review.com/as-luxury-sales-slumped-in-2023-hermes-surpassed-expectations/

[3]   https://www.pursebop.com/hermes-revenues-rise-22-in-first-half-of-2023-with-no-decline-in-united-states/ ; https://www.pursebop.com/hermes-birkins-and-kelly-help-lift-q1-2023-sales-23/

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

     i.  "There's nothing more iconic than the Hermès Birkin bag";

    ii.  "A Birkin handbag is a highly valuable asset in the physical world,"

   iii.  The Birkin's "mysterious waitlist, intimidating price tags and extreme scarcity have made it a highly covetable 'holy grail' handbag that doubles as an investment or store of value";

   iv.  "Hermès has sold millions of dollars' worth of Birkin handbags in significant quantities since its inception in 1986. Such sales have occurred in the United States, France, and throughout the world"; and

    v.  "The Birkin handbag has been recognized as one of the best investments any person can make with its increasing value beating returns from the stock market and even gold."

34.    The elitist luxury handbag market, recognized as a distinct economic entity by both the industry and consumers, operates independently from the general handbag market. Luxury handbags are characterized by their hand-crafted or artisan construction, exceptionally high price points often exceeding tens of thousands of dollars, and unique production processes emphasizing high-quality materials and craftsmanship. This market caters to a niche clientele of affluent consumers, utilizes specialized vendors and sales associates with expertise in high-end products, and exhibits a low sensitivity to price fluctuations.

35.    The elitist luxury handbag market tends to be relatively inelastic. Luxury handbag buyers are typically less price-sensitive than consumers of ordinary goods. They are often high-income individuals who view these items as status symbols, investments, or collectibles. Therefore, a price increase may not significantly deter their demand. True elitist luxury handbags, like the Birkin bag, have a unique brand identity, craftsmanship, and exclusivity that cannot be easily replicated. While there are other high-end brands, they may not be seen as perfect substitutes for a specific luxury handbag. This lack of substitutes reduces price elasticity. The lack of substitutes is shown by the fact that 75% of handbags listed for more than $20,000 on the secondhand market are Hermès handbags.

36.    Defendants have exploited the unique characteristics of the luxury handbag market,

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

including its relative inelasticity and affluent consumer base, to engage in a pattern of anti-competitive conduct. This market, characterized by consumers who view these items as status symbols, investments, or collectibles, demonstrates reduced price sensitivity, allowing Defendants to artificially inflate the true prices of their handbags (as opposed to the nominal, retail price of the Birkin bags). By leveraging the Birkin bag's unique brand identity, craftsmanship, and exclusivity, which are not easily replicated by other high-end brands, Defendants have created a market with limited direct substitutes, enabling them to maintain supracompetitive prices and engage in unlawful restraints of trade, including the illegal tying arrangements alleged herein.

37. Defendants have systematically exploited their dominant market position in the luxury handbag market to engage in a deceptive and manipulative pricing scheme, artificially inflating the true cost of their Birkin handbags and reaping supracompetitive profits. The nominal retail price of a Birkin bag is a facade, masking a hidden lottery system that forces consumers to purchase substantial amounts of Hermès Ancillary Products to "qualify" for the mere opportunity to buy a Birkin. This predatory practice not only drives up the true price of the Birkin bag – which includes the cost of these coerced Ancillary Product purchases – but also generates additional revenue for Defendants from consumers who never "qualify" and are left with Hermès Ancillary Products that they never would have purchased but for their desire to acquire a Birkin bag. This scheme represents a blatant abuse of market power and a deliberate deception of consumers, resulting in substantial financial harm to the Class.

38. The artificial suppression of the nominal retail price of Birkin handbags is evidenced by their robust resale value, which consistently and significantly exceeds the original purchase price. This stark disparity between the initial cost and the secondary market valuation unequivocally demonstrates that the advertised price is not the true price consumers ultimately pay and exposes Defendants' manipulation of the market to extract supracompetitive profits.

39. For example, a standard leather Birkin handbag can resell for 1.5 to 3 times its original retail price, while exotic skin Birkin bags command even higher premiums, often fetching 2 to 5 times their original price or more. A Birkin 25 in Togo leather with gold hardware, typically retailing for around $10,000, can easily command $20,000 or more on the resale market. This

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

1   extraordinary appreciation is supported by a study conducted by Baghunter, an online marketplace

2   for luxury handbags, which found that Birkin bags have offered an average annual return of 14.2%

3   over the past 35 years, with their value never decreasing.[4]

4   **THE TIED MARKET**

5     40. The tied market at issue is the market for luxury ready-to-wear apparel and

6   accessories. This includes ancillary products sold by Hermes and competitors such as Chanel and

7   Louis Vuitton, including scarves and shawls, ready to wear clothing, footwear, watches, jewelry,

8   fragrances, accessories (including hats, gloves, ties, and sunglasses), and home goods such as

9   table wear, furniture, blankets, and decorative objects like vases and trays.  The industry

10  recognizes luxury ready to wear apparel and accessories as a distinct market category.

11    41. The unique desirability, incredible demand and low supply of Birkin handbags gives

12  Defendants incredible market power.  Defendants implemented a scheme to exploit this market

13  power by requiring consumers to purchase other, ancillary products from Defendants before they

14  will be given an opportunity to purchase a Birkin handbag.  With this scheme Defendants were

15  able to effectively increase the price of Birkin handbags and, thus, the profits that Defendants earn

16  from Birkin handbags.  The tied products include designer shoes, scarves, belts, clothing, jewelry,

17  and home goods sold by Hermès ("Ancillary Products").  There is a market for each of these tied

18  products.

19    42. Birkin handbags cannot be purchased from Defendants through the Hermès website.

20  Instead, consumers can only purchase Birkin handbags from Defendants by physically going to a

21  *Hermès* retail store.  However, unlike most consumer products – and most other products sold by

22  Defendants – consumers cannot simply walk into a *Hermès* retail store, pick out the Birkin

23  handbag they want and purchase it.  Birkin handbags are never publicly displayed for sale at

24  *Hermès* retail stores.  Indeed, it is often the case that there are no Birkin handbags *at all* at *Hermès*

25  retail stores or, if there are, there are only one, two or at most three Birkin handbags.  But even if

26  there are Birkin handbags at a particular *Hermès* retail store, the handbags will not be displayed

27

28    [4] https://baghunter.com/pages/hermes-birkin-values-research-study

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

on the sales floor for the general public.  In fact, most consumers will never be shown a Birkin handbag at *Hermès* retail store.  Typically, only those consumers who are deemed worthy of purchasing a Birkin handbag will be shown a Birkin handbag (in a private room).  The chosen consumer will be given the opportunity to purchase the specific Birkin handbag that they are shown.  Consumers cannot order a Birking handbag at the retail location.  For all practical purposes, there is no way to order a bag in the style, size, color, leather, and hardware that a consumer wants.

43.     Hermès Sales Associates are tasked by Defendants with selecting those consumers who are qualified to purchase Birkin handbags.  These sales associates are directed by Defendants to only offer Birkin handbags to consumers who have established a sufficient "purchase history" or "purchase profile" with Defendants of Defendants' ancillary products such as shoes, scarves, belts, clothing, jewelry and home goods.  Only once a consumer has a sufficient purchase history or purchase profile with Defendants, will the consumer be offered the opportunity to purchase a Birkin handbag.

44.     Defendants have designed the compensation structure of their Sales Associates to ensure that they follow Defendants' policy of only selling Birkin handbags to consumers who have a sufficient purchase history of ancillary products.  Hermès Sales Associates are paid by the hour and also receive a commission on their sales.  The commission rates paid by Defendants to sales associates differ based on the type of product sold.  Sales Associates are paid 3% on ancillary products such as shoes, scarves, belts, jewelry and home goods; they are paid a 1.5% commission on non-Birkin handbags, and they receive *no* commission whatsoever on the sale of Birkin handbags.  Although Hermès Sales Associates receive *no* commission on the most valuable and sought-after products sold by their employer, they are instructed by Defendants to use Birkin handbags as a way to coerce consumers to purchase ancillary products sold by Defendants (for which the sales associates receive a 3% commission) in order to build-up the purchase history required to be offered a Birkin handbag.

45.     In this way, Defendants are able to use their Sales Associates to implement Defendants' illegal tying arrangement.

— 12 —

46. Through this illegal tying scheme, Hermès is able to force its customers to purchase ancillary products thereby foreclosing competition in the luxury ready to wear apparel and accessories market.

47. Hermès tying scheme affects a more than de minimis and substantial amount of interstate commerce in the luxury ready-to- wear apparel and accessories market. It leads customers to purchase products that they either do not want or would prefer to purchase from one of Hermès' competitors such as Chanel or Louis Vuitton.

48. As a Wall Street Journal article explains, an unusually large percentage of Hermès' non handbag products are sold in the secondhand market while in pristine condition, with the percentage being 35% for Hermès versus 20% for competitors such as Louis Vuitton: "An unusually large amount of new Hermès inventory ends up for sale in the secondhand market—another sign that Birkin mania might be driving sales of products that customers don't really want. Of all the nonhandbag Hermès items on The RealReal, 35% are in pristine condition, according to data supplied by the luxury resale website. The average for other designers on The RealReal, including Louis Vuitton, Gucci, Prada, Bottega Veneta and Saint Laurent, is 20%." The Crazy Economics of the World's Most Coveted Handbag, Wall Street Journal, June 22, 2024.

49. According to data from GlobalData.com (a world leading data and analytics company) Hermès has a 53% market share of the luxury apparel market, with the other key market players being Louis Vuitton, Gucci, Prada Dior, Ralph Lauren, and Versace.

50. Hermès' Financial Statements from 2015-2023 show a convergence between its revenues from the tying product and the tied products over time. For example, in 2015, Hermès' revenue from leather goods and saddlery was 47% and its revenue from ready to wear and accessories was 23%. In 2023 by contrast, Hermès' revenue from leather goods and saddlery was 41% and its revenue from ready to wear and accessories was 29%.

51. Defendants essentially implement a game, the Hermes game, to get a Birkin, whereby, customers need to purchase an unspecified number of tied products, for an unspecified amount, to win sufficient favor to get a Birkin. Defendants' tying scheme creates a highly inefficient market.

— 13 —

52.     Economic rationale for tying practices would suggest that a firm (i.e. Hermes) would use its leverage from a sub-market it dominates (the tying market, i.e. the elitist luxury handbags market), to increase its presence in another sub-market in which it does not have dominance (i.e. the tied market, luxury apparel and accessories markets). If a firm is allowed to practice tying over an extended period of time, then one would expect to see an increase in relative share of sales of the tied market, compared to the tying market (within Hermes), i.e. convergence of revenue shares over time is an expected outcome. That is in Hermes revenues over time, where the relative share of Hermes' luxury apparel and accessories have been steadily increasing over time and getting close to that of its revenue shares in the tying products (handbags).

### D.     Plaintiffs' Attempts to Purchase a Birkin Handbag.

53.     Plaintiff Cavalleri has spent tens of thousands of dollars at Hermès, and had been coerced into purchasing Ancillary Products in order to obtain access to Hermès Birkin bags, based on the practices alleged herein.  In or about September 2022, Plaintiff contacted Hermes about purchasing another Birkin bag but was told specialty bags are going to "clients who have been consistent in supporting our business."  Plaintiff Cavalleri understood she would have to spend more on Ancillary Products to obtain access to another Birkin Handbag.  As a result, Plaintiff Cavalleri was unable to purchase another Birkin Handbag in September 2022.

54.     In or about 2023, Plaintiff Glinoga sought to purchase a Birkin Handbag, but counseled by Defendant's sales associates to purchase Ancillary Products in order to potentially obtain a Berkin Handbag.  Plaintiff Glinoga made multiple attempts to purchase a Birkin bag, but was told on each occasion he needed to purchase other items and accessories.  As a result, Plaintiff Glinoga was unable to purchase a Birkin Handbag.

55.     In or about the Fall of 2023, Plaintiff Yang sought to purchase a Birkin bag at Defendants' San Francisco Hermès store.  Plaintiff Yang was informed by Defendants he would have to purchase Ancillary Products in order to obtain a Birkin bag and spent over $10,000 on Ancillary Products in order to purchase a Birkin bag.  Plaintiffs are informed and believe, and on that basis allege, that Defendants tied Plaintiffs' access to purchase a Birkin Handbag to a

— 14 —

requirement that they spend more on other items, pursuant to the unlawful tying arrangement alleged herein.

56.     As a result of the unlawful tying scheme, Plaintiffs were forced to purchase products that they either did not want or would have preferred to purchase from Hermès competitors. Specifically, Plaintiff Cavalleri purchased, among other items, a Vetiva Tonka fragrance and a Hermes polo hat, as well as clothing, housewares, scarves, blankets, hats and shoes totalling thousands of dollars. Plaintiff Yang, purchased, among other items, shoes, clothing, a belt and a tie totaling thousands of dollars.

57.     Plaintiffs have suffered injury as a result of Defendants' unlawful practice, including but not limited to, being required to expend money to purchase Ancillary Products from Defendants.  Plaintiffs have suffered injury as a result of Defendants' unlawful practice by being denied the opportunity to obtain a Birkin bag, which as set forth herein, can be resold at a higher price, because of Defendants' tying practices.  Plaintiffs are informed and believe, and on that basis allege, that Defendants' unlawful practice also causes economic harm because it reduces competition in the market for the tied products.  Plaintiffs are informed and believe, and on that basis allege, that Defendants' competitors in the tied markets cannot make sales for Ancillary Products that are purchased as a result of the coercive effect of Defendants' tying practice.

## CLASS ACTION ALLEGATIONS

58.     Plaintiffs bring this action on behalf of themselves and as representatives of all others who are similarly situated.  Pursuant to Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following class and subclass that are initially defined as follows:

> **Class**: All residents of the United States who, from four
> years prior to the filing of this complaint until the date
> that notice of this class action is disseminated to the
> class, purchased or were asked to purchase Ancillary

Products in order to purchase a Birkin Handbag (the "Class").

**Subclass**:  All residents of California who, from four years prior to the filing of this complaint until the date that notice of this class action is disseminated to the class, purchased or were asked to purchase Ancillary Products in order to purchase a Birkin Handbag (the "Subclass").

**Misrepresentation Subclass**:  All residents of California who, from four years prior to the filing of this complaint until the date notice of this class action is disseminated to the class, purchased Ancillary Products in order to purchase a Birkin Handbag and were not able to subsequently purchase one.

59.   For purposes of the above class definitions, "*Ancillary Products*" include shoes, scarves, belts, jewelry, home goods sold, and other luxury apparel and accessories sold at Hermès' branded retail boutiques, for which Sales Agents receive a commission, but excludes any Birkin, Kelly or Constance branded handbag.   For purposes of the above class definitions, "*Birkin Handbag*" shall consist of any handbag manufactured and sold by Hermès' under the tradename of "Birkin" or "Kelly."

60.   Excluded from each of the above classes are Defendants, including any entity in which Defendants have a controlling interest, are a parent or subsidiary, or which are controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendants.  Also excluded are the judges and court personnel in this case and any members of their immediate families.

61.   Plaintiffs reserve the right to amend or modify the above class definition with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

62.     This action has been brought and may be properly maintained on behalf of the classes proposed herein under Rule 23 of the Federal Rules of Civil Procedure.

63.     <u>Numerosity</u>. Fed. R. Civ. P. 23(a)(1).  The members of each class and subclass are so numerous that joinder of all members is impractical.  Plaintiffs are informed and believe that there are thousands of members of each of the classes.

64.     <u>Commonality and Predominance.</u> Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact common to each class, which predominate over any questions affecting individual members of each respective class.  These common questions of law and fact include, without limitation:

      a.  Whether the Birkin handbags and Defendants' ancillary products are separate and distinct;

      b.  Whether Defendants implemented a policy to ensure that their sales associates would only sell Birkin handbags to consumers with a sufficient purchase history of Defendants' ancillary products; and

      c.  Whether Defendants have sufficient economic power in the market for Birkin handbags to coerce at least some consumers into purchasing Defendants' ancillary products;

      d.  Whether Defendants unlawfully tied the sale of Birkin handbags to the sale of Ancillary products; and

      e.  Whether Plaintiffs and the members of the Class and Subclass have been damaged by the wrongs complained of herein, and if so, the measure of those damages and the nature and extent of other relief that should be afforded.

65.     <u>Typicality.</u> Fed. R. Civ. P. 23 (a)(3).  Plaintiffs' claims are typical of the claims of the classes they seek to represent.  Plaintiffs and all Class and Subclass members were exposed to uniform practices and sustained injuries arising out of and caused by Defendants' conduct.

66.     <u>Adequacy.</u> Fed. R. Civ. P. 23(a)(4).  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately

— 17 —

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

1  protect the interests of the Class and Subclass.

2        67.    <u>Superiority.</u> Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available

3  methods for the fair and efficient adjudication of this controversy.  Since the amount of each

4  individual Class and Subclass member's claim is small relative to the complexity of the litigation,

5  and due to the financial resources of Defendants, no Class member could afford to seek legal

6  redress individually for the claims alleged herein.  Therefore, absent a class action, Class and

7  Subclass members will continue to suffer losses and Defendants' misconduct will proceed without

8  remedy.  Even if Class or Subclass members themselves could afford such individual litigation,

9  the court system could not.  Given the complex legal and factual issues involved, individualized

10  litigation would significantly increase the delay and expense to all parties and to the Court.

11  Individualized litigation would also create the potential for inconsistent or contradictory rulings.

12  By contrast, a class action presents far fewer management difficulties, allows claims to be heard

13  which might otherwise go unheard because of the relative expense of bringing individual lawsuits,

14  and provides the benefits of adjudication, economies of scale and comprehensive supervision by

15  a single court.  Finally, Plaintiffs know of no difficulty that will be encountered in the management

16  of this litigation which would preclude its maintenance as a class action.

**<u>FIRST CLAIM FOR RELIEF</u>**
**Violation of the Sherman Act**
*15 U.S.C. § 1*
**(By Plaintiffs and the Class Against Defendants)**

20        68.    Plaintiffs reallege and incorporate by reference the allegations contained in the

21  preceding paragraphs, inclusive, of this Complaint, as though fully set forth herein and, to the

22  extent necessary, plead this cause of action in the alternative.

23        69.    Plaintiffs bring this claim individually and on behalf of the members of the Class

24  against Defendants under federal law.

25        70.    An unlawful tying arrangement exists, and constitutes a per se violation of Section

26  1 of the Sherman Act, where a seller conditions the sale of a good or service in one market (the

27  tying product) upon the buyer's agreement to (a) buy a second good or service (the "tied" product)

28        71.    As detailed above, Defendants have unlawfully tied their Birkin handbags to their

— 18 —

Ancillary Products through their sales associate incentive program. A market exists for both the tying and tied products, the Birkin handbag and ancillary products, respectively.  In implementing this tying scheme, Defendants engaged in concerted action with Plaintiffs, class members, and its customers, who were the victims.

72.     Defendants have sufficient economic power in the tying market, the elitist luxury handbag market, to affect competition in the tied market.  Defendants willfully and intentionally engage in predatory, exclusionary, and anticompetitive conduct with the design, purpose, and effect of unlawfully maintaining their market and/or monopoly power.

73.     The availability of the Birkin handbags is conditioned on customers purchasing Ancillary Products from Defendants.  In other words, consumers are coerced into purchasing Ancillary Products from Defendants by virtue of wanting to purchase the Birkin handbags.  This is anticompetitive, tying conduct.

74.     The tying product, the Birkin handbags, is separate and distinct from the tied products, the Ancillary Products required to be purchased by consumers, because consumers such as Plaintiffs have alternative options for the Ancillary Products and would prefer to choose among them independently from their decision to purchase Birkin handbags.  Defendants' unlawful tying arrangements thus ties two separate products that are in separate markets.

75.     Defendants and the Birkin handbag have sufficient economic power in the market for luxury handbags to coerce at least some consumers into purchasing ancillary products from Defendants.  Defendants' conduct affects and has affected a substantial volume of commerce, far exceeding a de minimis amount.

76.     There are no legitimate procompetitive business justifications for this unlawful tying scheme.

77.     In the event that Defendants' anticompetitive course of conduct is not deemed to be a per se violation of Section 1 of the Sherman Act, it also constitutes a violation under both the rule of reason and a "quick look" analysis, as an observer with only a rudimentary understanding of economics could readily conclude that the tying scheme has an anti-competitive effect and unreasonably restrained competition in the tied market.

— 19 —

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

78.     Plaintiffs and the other members of the Class were harmed and Defendants' violation of the Sherman Act was a substantial factor in causing this harm.

## SECOND  CLAIM FOR RELIEF
### Violation of the Sherman Act
### *15 U.S.C. § 2*
### (By Plaintiffs and the Class Against Defendants)

77.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

78.     Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants under federal law.

79.     The Sherman Act prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."  15 U.S.C. §2.

80.     As detailed above, Defendants have unlawfully tied their Birkin handbags to their Ancillary Products through their sales associate incentive program. A market exists for both the tying and tied products, the Berkin handbag and ancillary products, respectively.

81.     Defendants have sufficient economic power in the tying market, the luxury handbag market, to affect competition in the tied market, ancillary products.  Defendants willfully and intentionally engage in predatory, exclusionary, and anticompetitive conduct with the design, purpose, and effect of unlawfully maintaining their market and/or monopoly power.

82.     The availability of the Birkin handbags is conditioned on customers purchasing Ancillary Products from Defendants.  In other words, consumers are coerced into purchasing Ancillary Products from Defendants by virtue of wanting to purchase the Birkin handbags.  This is anticompetitive, tying conduct.

83.     The tying product, the Birkin handbags, is separate and distinct from the tied products, the Ancillary Products required to be purchased by consumers, because consumers such as Plaintiffs have alternative options for the Ancillary Products and would prefer to choose among them independently from their decision to purchase Birkin handbags.  Defendants' unlawful tying arrangements thus ties two separate products that are in separate markets.

— 20 —

84.     Defendants and the Birkin handbag have sufficient economic power in the market for luxury handbags to coerce at least some consumers into purchasing ancillary products from Defendants.  Defendants' conduct affects and has affected a substantial volume of commerce, far exceeding a de minimis amount.

85.     Plaintiffs and the other members of the Class were harmed and Defendants' violation of the Sherman Act was a substantial factor in causing this harm.

**THIRD CLAIM FOR RELIEF**
**Violation of the Cartwright Act**
*Cal. Bus. & Prof. Code, § 16720*
**(By Plaintiffs and the Subclass Against Defendants)**

86.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

87.     Plaintiffs bring this claim individually and on behalf of the members of the Subclass against Defendants under California law.

88.     Defendants' acts and practices detailed herein violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce, or to prevent market competition. (Cal. Bus. & Prof. Code, §§ 16720, 16726.)

89.     Under the Cartwright Act, a "combination" is formed when the anticompetitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

90.     The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such

— 21 —

condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." (Cal. Bus. & Prof. Code, § 16727.)

91.   As detailed above, Defendants have unlawfully tied their Birkin handbags to their Ancillary Products through their Sales Associate incentive program, resulting in a combination between Defendants and their customers that prevent competition in the tied market.

92.   Defendants have sufficient economic power in the tying market for elitist luxury handbags, to affect competition in the tied market, Ancillary Products.

93.   The availability of the Birkin handbags is conditioned on customers purchasing Ancillary Products from Defendants.   In other words, consumers are coerced into purchasing Ancillary Products from Defendants by virtue of wanting to purchase the Birkin handbags.

94.   The tying product, the Birkin handbags, is separate and distinct from the tied products, the Ancillary Products required to be purchased by consumers because consumers such as Plaintiffs have alternative options for the ancillary products and would prefer to choose among them independently from their decision to purchase Birkin handbags.  Defendants' unlawful tying arrangements thus tie two separate products that are in separate markets.

95.   Defendants have sufficient economic power in the market for luxury handbags to coerce at least some consumers into purchasing Ancillary Products from Defendants.

96.   Plaintiffs and the other members of the Subclass were harmed and Defendants' violation of the Carwright Act was a substantial factor in causing this harm.

**FOURTH CLAIM FOR RELIEF**
**Violation of the Cartwright Act**
*Cal. Bus. & Prof. Code, § 16727*
**(By Plaintiffs and the Subclass Against Defendants)**

97.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

98.   Plaintiffs bring this claim individually and on behalf of the members of the Subclass against Defendants under California law.

1    99.   Defendants' acts and practices detailed herein violate the Cartwright Act, Cal. Bus.

2    & Prof. Code § 16727.

3    100.   Business & Professions Code § 16727 makes it unlawful for any person to lease or

4    make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for

5    use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price,

6    on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or

7    deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or

8    competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such

9    condition, agreement or understanding may be to substantially lessen competition or tend to create

10   a monopoly in any line of trade or commerce in any section of the State." (Cal. Bus. & Prof. Code,

11   § 16727.)

12   101.   As detailed above, Defendants have unlawfully tied their Birkin handbags to their

13   ancillary products through their sales associate incentive program

14   102.   Defendants have sufficient economic power in the tying market for elitist luxury

15   handbags to affect competition in the tied market, Ancillary Products.

16   103.   The availability of the Birkin handbags is conditioned on customers purchasing

17   Ancillary Products from Defendants.   In other words, consumers are coerced into purchasing

18   Ancillary Products from Defendants by virtue of wanting to purchase the Birkin handbags.

19   104.   The tying product, the Birkin handbags, is separate and distinct from the tied

20   products, the Ancillary Products required to be purchased by consumers, because consumers such

21   as Plaintiffs have alternative options for the Ancillary Products and would prefer to choose among

22   them independently from their decision to purchase Birkin handbags.  Defendants' unlawful tying

23   arrangements thus ties two separate products that are in separate markets.

24   105.   Defendants have sufficient economic power in the market for Birkin handbags to

25   coerce at least some consumers into purchasing ancillary products from Defendants.

26   106.   Plaintiffs and the other members of the Subclass were harmed, and Defendants'

27   violation of the Carwright Act was a substantial factor in causing this harm.

28   WHEREFORE, Plaintiffs and the Class pray judgment against Defendants as hereafter set

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

1    forth.

2    **FIFTH CLAIM FOR RELIEF**
3    **Violation of California's Unfair Competition Law**
     *Cal. Bus. & Prof. Code, § 17200, et seq.*
4    **(By Plaintiffs and the Subclass and the Misrepresentation Subclass Against Defendants)**

5    107.   Plaintiffs reallege and incorporate by reference the allegations contained in the
6    preceding paragraphs, inclusive, of this Complaint, as though fully set forth herein and, to the
7    extent necessary, plead this cause of action in the alternative.

8    108.   Plaintiffs bring this claim individually and on behalf of the members of the Subclass
9    against Defendants under California law.

10   109.   Plaintiffs have standing to pursue this cause of action as Plaintiffs have suffered
11   injury in fact and have lost money or property as a result of Defendants' actions as delineated
12   herein.

13   110.   Defendants' scheme, as delineated herein, constitutes unlawful business practices
14   in violation of California Business and Professions Code sections 17200, *et seq.*

15   111.   Defendants' business practices, as alleged herein, violate the "unlawful" prong of
16   California Business & Professions Code sections 17200, *et seq.* because Defendants' conduct
17   violates, *inter alia*, the Cartwright Act, the Sherman Act, and Section 5(a)(1) of the FTC Act, 15
18   U.S.C. § 45(a)(1).

19   112.   Defendants' business practices, as alleged herein, violate the "unfair" prong of
20   California Business & Professions Code sections 17200, *et seq.* under both the "tethering" and
21   "balancing" tests for unfair business practices.

22   113.   Defendants' business practices, as alleged herein, are unfair under the "tethering"
23   test because their conduct: (i) contravenes the policy and spirit of the Sherman Act and Cartwright
24   Act's prohibitions on tying arrangements; (ii) results in effects comparable to, or the same as, a
25   direct violation of these anti-tying prohibitions; and (iii) poses a significant threat to or harm on
26   competition within the market.

27   114.   Defendants' business practices, as alleged herein, violate the "balancing" test for
28   unfair business practices because the harm to consumers outweighs the utility, if any, of the

— 24 —

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

challenged conduct.

115.    The consumer injury resulting from Defendants' business practices, as alleged herein, is substantial, not outweighed by any countervailing benefits to consumers or to competition, and not an injury that the consumers themselves could reasonably have avoided.

116.    Defendants' conduct is also a deceptive business practice in that Defendants induce consumers to pay money for ancillary products in order to get a Birkin bag, when Defendants know that many of the people they induce to buy ancillary products will not in fact get a Birkin bag.

117.    Accordingly, Defendants violated, and continue to violate, California Business and Professions Code section 17200's proscription against engaging in unlawful and/or unfair or deceptive business acts or practices.

118.    As a direct and proximate result of Defendants' unlawful business practices, Plaintiffs and the Class have suffered injury in fact and lost money or property, in that they purchased ancillary products from Defendants that they did not want or could have purchased elsewhere.

119.    Pursuant to California Business and Professions Code section 17203, Plaintiffs and the Class seek an order of this court enjoining Defendants from continuing to engage in unlawful, unfair, or deceptive business practices and any other act prohibited by law, including those acts set forth in the complaint.

120.    Plaintiffs and the Subclass also seek an order requiring Defendants to make full restitution of all monies they wrongfully obtained from Plaintiffs and the Class.

## SIXTH CLAIM FOR RELIEF
### For Violations of California's False Advertising Law
### Business & Professions Code § 17500
### (By Plaintiffs and the Misrepresentation Subclass Against Defendants)

121.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)

122.   Defendants have made untrue and misleading statements, as alleged herein, which constitute a violation of Business & Professions Code § 17500 et seq.

122.   Defendants untrue or misleading statement include marketing the Birkin for sale, and stating on their website that the Birkin is available to consumers to purchase.  As an example, Defendants state on their website that "[t]he Birkin is available" with certain features.  This is untrue or misleading because the Birkin is not available to consumers unless they also purchase Accessory items to obtain the Birkin, pursuant to Defendants' tying scheme.

123.  In addition, Defendants' salespersons represent to customers that they will be able to purchase the Birkin Bag if they purchase Ancillary products. However, Defendants know or should know that for many of the customers who purchase Ancillary products for this purpose they will not be provided the ability to purchase a Birkin Bag, or will be required to purchase more Ancillary products in order to obtain a Birkin bag.

124.   As an example, at the San Francisco Hermes store, in or about May 11, 2023 and August 30, 2023, Defendant's sales associate, Lonna, employee #118802, induced Plaintiff Yang to purchase Accessory items by stating by purchasing Accessory items Plaintiff would be able to purchase a Birkin.

125.   Plaintiff Yang actually and justifiably relied on Defendants' untrue and misleading representations in making the purchases.  Plaintiff Yang was subsequently required to purchase additional Accessory items to get a Birkin bag, and suffered loss and injury in fact.

126.   Similarly, Plaintiff Cavalleri was told by sales representative Cecilia Ceballos in approximately 2013 and sales representative MacKenzie (last name unknown) in approximately 2020 that she needed to purchase Accessory items in order to purchase a Birkin. After being able to purchase a Birkin in 2013 and 2020 after purchasing accessory items. Cavalleri spent in excess of $10,000 including at the Beverly Hills, California Hermes store to obtain a Birkin, but was unable to obtain one. Accordingly, Cavalleri suffered loss and injury in fact.

127.   As a result of Defendants' conduct, Plaintiff and the Class have been damaged, including being required to purchase Ancillary items, as alleged herein.

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### SIXTH CLAIM FOR RELIEF
**For Common Law Fraud**
**(By Plaintiffs and the Misrepresentation Subclass Against Defendants)**

128.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

129.   Defendants through their sales persons represent to customers that they will be able to purchase the Birkin Bag if they purchase ancillary products.

130.   These representations are false because Defendants know that for many of the customers who purchase ancillary products for this purpose, they will not be provided the ability to purchase a Birkin Bag, or will be required to purchase more Ancillary products in order to obtain a Birkin bag.

131.   Plaintiffs and the class members could not in the exercise of reasonable diligence have discovered the falsity of the representations set forth above.

132.   Plaintiffs and the class members relied upon the representations in their decision to purchase ancillary products.

133.   As a proximate result of Defendants' representations, Plaintiffs and the class members were damaged in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF
**For Negligent Misrepresentation**
**(By Plaintiffs and the Misrepresentation Subclass Against Defendants)**

134.   Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs, inclusive, of this Complaint, as though fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

135.   Defendants through their sales persons represent to customers that they will be able to purchase the Birkin Bag if they purchase ancillary products.

136.   These representations are false because Defendants know that for many of the customers who purchase ancillary products for this purpose, they will not be provided the ability to purchase a Birkin Bag, or will be required to purchase more Ancillary products in order to

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

obtain a Birkin bag.

137.   Plaintiffs and the class members could not in the exercise of reasonable diligence have discovered the falsity of the representations set forth above.

138.   Plaintiffs and the class members relied upon the representations in their decision to purchase ancillary products.

139.   As a proximate result of Defendants' representations, Plaintiffs and the class members were damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment against Defendants, as follows:

1.   An order certifying appropriate classes and/or subclasses, designating Plaintiffs as the class representatives and their counsel as class counsel;

2.   An order enjoining Defendants from continuing to engage in the practices complained of herein;

3.   An award of restitution, damages, punitive damages, treble damages and disgorgement to Plaintiffs and the Class and Subclass in an amount to be determined at trial;

4.   An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded, as allowed by law;

5.   An award of costs and attorneys' fees, as allowed by law; and

6.   Such other or further relief as may be appropriate.


Dated:  October 11, 2024                SETAREH LAW GROUP


                                        By: /s/ Shaun Setareh
                                            Shaun Setareh
                                            Thomas Segal


                                        HAFFNER LAW PC
                                            Joshua H. Haffner
                                            Alfredo Torrijos

— 28 —

Vahan Mikayelyan
*Counsel for Plaintiffs and the Proposed Class and Subclass*

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

1

**DEMAND FOR JURY TRIAL**

2          Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a

3    trial by jury of any and all issues in this action so triable of right.

4

5    Dated:  October 11, 2024                    SETAREH LAW GROUP

6
                                                By:  /s/ Shaun Setareh
7                                                    Shaun C. Setareh
                                                    Thomas A. Segal
8

9
                                                HAFFNER LAW PC
10                                                   Joshua H. Haffner
                                                    Alfredo Torrijos
11                                                   Vahan Mikayelyan

12
                                                *Counsel for Plaintiffs and the Proposed Class and*
13                                                *Subclass*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND AMENDED CLASS ACTION COMPLAINT (Case No. 3:24-cv-01707-JD)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I am a citizen of the United States and am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 420 North Camden Drive, Beverly Hills, CA 90210.

On October 11, 2024, I served the foregoing documents described as:

**SECOND AMENDED CLASS ACTION COMPLAINT**

in this action by transmitting a true copy thereof addressed as follows:

| | |
|---|---|
| Joshua H. Haffner | Christopher S. Yates |
| jhh@haffnerlawyers.com | Belinda S Lee |
| Alfredo Torrijos | Ashley M. Bauer |
| at@haffnerlawyers.com | LATHAM & WATKINS LLP |
| Vahan Mikayelyan | 505 Montgomery Street, Suite 2000 |
| vh@haffnerlawyers.com | San Francisco, California 94111-6538 |
| HAFFNER LAW PC | Chris.Yates@lw.com |
| 15260 Ventura Blvd., Suite 1520 | Belinda.Lee@lw.com |
| Sherman Oaks, California 91403 | Ashley.Bauer@lw.com |
| **Attorneys for Plaintiffs** | **Attorney for Defendants** |
| **and the Proposed Class** | **HERMÈS OF PARIS, INC. AND** |
| | **HERMÈS INTERNATIONAL** |

**[X]      ONLY BY ELECTRONIC TRANSMISSION – ECF:** Based on a court order or agreement of the parties to accept service by e-mail or electronic transmission via Court's CM/ECF system as indicated on the service list.

**[X]      (FEDERAL)** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on October 11, 2024, at Beverly Hills, California.

_____
Diana Maytorena

PROOF OF SERVICE