# EXHIBIT 2

GFB pp. 167–178  Intellect Limited 2014

Global Fashion Brands: Style, Luxury & History
© 2014 Intellect Ltd Chapter. English language. doi: 10.1386/GFB.1.167_1

**TASHA L. LEWIS**
Cornell University

**BRITTANY HAAS**
Hermès of Paris

# Managing an iconic old luxury brand in a new luxury economy: Hermès handbags in the US market

## ABSTRACT

*The Hermès brand is synonymous with a wealthy global elite clientele and its products have maintained an enduring heritage of craftsmanship that has distinguished it among competing luxury brands in the global market. Hermès has remained a family business for generations and has successfully avoided recent acquisition attempts by luxury group LVMH. Almost half of the luxury firm's revenue ($1.5bn in 2012) is derived from the sale of its leather goods and saddlery, which includes its handbags. A large contributor to sales is global demand for one of its leather accessories, the Birkin bag, ranging in price from $10,000 to $250,000. Increased demand for the bag in the United States since 2002 resulted in an extensive customer waitlist lasting from months to a few years. Hermès retired the famed waitlist (sometimes called the 'dream list') in the United States in 2010, and while the waitlist has been removed, demand for the Birkin bag has not diminished and making the bag available to luxury consumers requires extensive, careful distribution management. In addition to inventory constraints related to demand for the Birkin bag in the*

## KEYWORDS

European luxury
Hermès
American consumers
women's accessories
status consumption
aspirational brands

Tasha L. Lewis | Brittany Haas

*United States, Hermès must also manage a range of other factors in the US market. These factors include competition with 'affordable' luxury brands like Coach, monitoring of unsolicited brand endorsers as well as counterfeit goods and resellers. This article examines some of the allocation practices used to carefully manage the Hermès brand in the US market.*

## INTRODUCTION

### *Hermès*

Thierry Hermès established the company in 1837 as a wholesale business providing harnesses to carriage builders. By 1879, Thierry's son Émile-Charles had opened the Hermès flagship store in Paris and began production and sale of saddles and other equestrian accessories to an upper-class clientele able to afford the expense of carriages and horses. Eventually, during the Industrial Revolution, Hermès realized that in order to keep up with the invention of the automobile, their breadth of product needed to expand. Hermès then branched into luggage and luxury travel goods, as well as silk scarves for women to wrap on their heads for long car rides. Émile's son, Émile-Maurice, was responsible for the addition of luggage, portable furniture and other travel-related items designed to accommodate the various emerging modes of transportation and travel occasions (ocean liner, safari, airplane), but the company was careful not to forsake its equestrian heritage and still provided the requisite tools for the sport of horse riding, which became even more prestigious once other forms of transportation replaced the carriage (Milbank 2005). The company has remained family owned for several generations with control divided amongst more than 200 family members. Current Executive Chairman and CEO, Patrick Thomas, is the first non-family member to head the luxury firm. The company will return to family leadership in 2014 after Thomas retires and Axel Dumas (a sixth generation descendant of founder Thierry Hermès) assumes the role of CEO.

### *Design and development of handbags*

In the hierarchy of luxury handbags, Hermès is the uncontested leader and its products classified as the 'equivalent of a Rolls Royce or Chanel couture suit' (Thomas 2007: 171). The tradition of bag-making at Hermès evolved with its heritage of equestrian craftsmanship, and one of the earliest styles was the *Haute a Courroies*/High Belts bag. It was designed by Émile-Maurice Hermès around 1900 who drew inspiration for the design from similar bags he saw being used by Argentine gauchos. The design is the genesis of both the iconic Kelly and Birkin bags. The popularity of the Kelly bag is notably tied to 1956, when American movie actress and Princess of Monaco, Grace Kelly, was shown on the cover of *LIFE* magazine carrying a large *Haute a Courroies* to conceal her yet unannounced pregnancy. The bag was in immediate demand and sales soared, earning it the signature nickname associated with the Princess (Milbank 2005). The Birkin bag was the result of purposeful design collaboration with British actress/singer Jane Birkin and then Hermès chairman, Jean-Louis Dumas, who responded to the actresses' desire for a proper travel bag. Also popularized due to the notoriety of its carrier was the Constance bag (1967), a favourite accessory of

Jackie Kennedy Onassis. A single Hermès handbag requires eighteen to 25 hours of labour in Paris workshops with a production output of about five bags per week (Jacobs 2007). Hermès does not outsource production nor does it license its name for other product categories. Its sourcing model is in contrast to other luxury brands that have managed to increase handbag production in order to appeal to global demand for luxury in emerging consumer markets.

### Making an icon

Hermès handbags are entirely crafted in France and a single Birkin bag takes approximately two days to complete. The high degree of hand-work combined with the limited availability of precious leather skins does constrain the production output of the bag and thus the quantity allocated to the global market. The quantity of Birkin bags distributed throughout US stores is based on clientele in each location. While most stores receive bags in their inventory, the majority of bags are allocated to stores in New York City, Beverly Hills, Las Vegas and Honolulu. These markets are characterized by a disproportionate number of high net worth individuals as well as tourists (domestic and international) shopping for Hermès handbags.

The Birkin assortment can vary based on the materials used, which include exotic skins such as ostrich, crocodile and alligator. Hermès owns an alligator farm in the Gulf region of the United States to ensure the supply and quality of its exotic skins. Other farms (for crocodile skins) are located in Africa and Australia (Thomas 2007). It takes about three skins to make a bag from alligator or crocodile since Hermès only uses the soft skin from the underside of the animal and skins are matched to obtain similar patterns on a single handbag (Thomas 2007). The number of bags sent to any given store may be based on its high dollar value (particularly for more rare skins like ostrich and crocodile) or based on units. Sizes for the bag are 28, 30, 35, 40 and 45 cm and correspond to the measured length across the bottom of a particular bag. Leather Birkin bag varieties may include five to six per season, each with its own style name (e.g. Togo, Clemence, Swift, Barrenia, Box, etc.). Within a given leather variety, there are approximately ten colors available per season. In addition to this assortment, limited novelty models of the bag are also made available such as the Sailor Birkin, Golf Birkin, Flag Birkin and 2-tone Birkin. To celebrate the twentieth anniversary of the Birkin in 2004, Hermès created the Birkin25 made from *braise*-shaded crocodile, with a white gold clasp and padlock studded with diamonds and priced at $81,000 (Anon. 2004). These novelty bags are presented each season to add variety and exclusivity for collectors of Hermès bags. Their availability depends on the individual store's decision to order the bags for its clients.

## OLD LUXURY: SCARCITY AND EXCLUSIVITY

Luxury products are synonymous with exclusivity and scarcity. If luxury products become too accessible they lose their status, which is one of the primary motivations for luxury consumption. Price plays a significant role in who is able to afford luxury products and serves to confirm the degree of rarity and exclusivity of a product (Dubois and Duquense 1993). Luxury products do not conform to the traditional demand curve for products, which predict a decline in product quantity demanded as price increases. Instead, luxury products tend to experience greater demand at higher prices with a diminishing

demand as prices decline (Rath et al. 2012). In addition to price or perceived conspicuous value (the Veblen effect), other influences that serve to reinforce the exclusivity of luxury products include perceived unique value (snob effect) and perceived social value (bandwagon effect). With the *Veblen effect*, demand for a product rises because its price is higher and price serves as a conspicuous indicator of prestige and serves to impress others. The *snob effect* describes the perception of price as an indicator of exclusivity and consumers in this category avoid using brands available to the general masses. The *bandwagon effect* is driven by consumer desire to convey membership with a particular group by consuming prestige products (Leibstein 1950; Vigneron and Johnson 1999). Arguably, all of these influences are involved in the demand for Birkin and Kelly bags due to their symbolism of wealth (Veblen), scarcity (snob) and elite class (bandwagon) membership. These influences are more pronounced as luxury products are experiencing global demand and pressures to grow their brands in order to satisfy emerging market consumers eager to display their economic success.

Bernard Catry (2003) notes how some luxury goods companies have consciously created an environment of scarcity, unrelated to any production limitations, which ensures that products are perceived as rare and precious. On the other hand, the scarcity of the Birkin bag is a result of the amount of time (labour) it takes to create each bag (about two days). Undoubtedly, Hermès' handbags embody the brand's equestrian heritage and the craftsmanship associated with each hand-made bag is well known to its customers, not as a marketing tool but rather as a justification for its prestige status and ultra-premium price point (ranging from $10,000 to $250,000). In 2011, in response to bottlenecks in its production, Hermès announced that it would expand production capacity by opening two new factories in France dedicated to its leather goods and saddlery in order to sustain the momentum behind its strong growth (Diderich 2012c).

In spite of its limited production, the Birkin bag has experienced saturation in some international markets, particularly Asia. A July 2012 *Forbes* article (Carreon 2012) discusses how the Birkin bag may have lost some of its exclusive luxury appeal due to its ubiquity in places like Hong Kong and Singapore. However, in mainland China's explosive luxury market, Hermès bags, due to their scarcity, craftsmanship and pricing, are still highly desired as a sign of status and absolute luxury in contrast to brands like Louis Vuitton which has experienced diminished luxury appeal and has shifted to the 'new luxury' position of a prestige brand due to its accessibility and over exposure in the market (Lee 2012). As Birkin consumers increase globally and seek a more luxurious product, Hermès continues to raise the bar on the exclusivity of the Birkin. The most expensive Birkin bags are priced at around $275,000–300,000 and usually feature diamond hardware. The United States is offered a limited amount of these bags per year, and they are only offered to the top spending clients. There is a degree of customer segmentation as well as segmentation among Hermès stores. The demand clearly outweighs the supply, and bags are allocated between all of the different global subsidiaries. Hermès of Paris US retail stores are only allocated a certain number of Birkin bags per year to sell and quantities are less than those allocated to markets in Asia and Europe. In addition, all global customers are only allowed to purchase two Birkin bags annually. The Asia-Pacific region receives the most Hermès bags globally due to the high level of bag penetration in this market.

## NEW LUXURY: ACCESSIBILITY AND ASPIRATION

While Hermès handbags are the pre-eminent marker of luxury for its owners, the Birkin and Kelly bags have grown to iconic status among consumers, from the traditional old luxury, wealthy patrons of the brand to new luxury aspirants. Popular media has influenced consumer awareness of Birkin and Kelly bags, which is not that different from its past appearances on the arms of royals and international celebrities, which were images congruent with the old luxury heritage of Hermès. However, the conspicuous consumption of Birkin and Kelly bags by media moguls, hip hop royalty and reality television stars (mainly in the United States) has exposed a new group of consumers primarily in the 'new' luxury segment. Reality television star Kim Kardashian reportedly spent close to $100K in the Paris store that included the purchase of six Birkin bags (Apatoff 2010). Television personality Martha Stewart carried her Birkin bag during her 2004 court appearance and received criticism due to the nature of the accusations she faced (insider trading). However, the bag was seen as a worthy representation of her image as a 'formidable snob' (Warren 2004).

Indeed luxury products have become more visible and accessible to consumers as brands have extended their offerings to aspirational consumers. Michael J. Silverstein and Neil Fiske call this market 'new luxury' and distinguish it from old luxury, which is described as 'aloof, exclusive, expensive, handmade and elitist' (2003: 52). New luxury is characterized as 'engaging, affordable, premium, mass artisanal, and value driven' (2003: 52). New luxury categories include accessible super-premium, old luxury brand extensions and *masstige* products. Accessible super-premium items are priced well above conventional products in the same category but are affordable to the new luxury consumer. Coach handbags were specifically repositioned at the affordable luxury category by its new CEO in 1996 (Thomas 2007). Old luxury brand extensions include product lines created for lower price points by traditional luxury brands, like Mercedes-Benz or Armani. There is also a category of new luxury known as *masstige* (mass+prestige) brands, which are not associated with old luxury by extension, nor do they possess super-premium price tags, but are higher priced than conventional products in the category (Victoria's Secret lingerie). Consumers of new luxury were described as relatively affluent (making more than $50,000 a year), but the spending on new luxury items was distributed across a wide range of income levels in the United States. (Silverstein and Fiske 2003). Median income for households in the United States have hovered around $50,000 since 2003 (United States Census Bureau 2013), making half of US households potential consumers of new luxury products.

Hermès has not embraced any new luxury brand approaches for the US market although it competes with the more accessible luxury brands. However, it has made adjustments to its Asia market strategy and introduced the Shang Xia Chinese brand to provide lower price point items in its largest market (Asia-Pacific). Accessible luxury brands in the United States include American brands like Ralph Lauren, Tommy Hilfiger, Michael Kors, and most importantly, Coach – a major player in the handbag market. It has been estimated that close to 80% of the US luxury apparel market is actually comprised of accessible (new) luxury, 16% of the market is categorized as 'aspirational' luxury (Louis Vuitton, Gucci) and a modest 3% as 'elitist' luxury, which includes Hermès and Chanel (Bernstein Research 2010). These ratios also

correspond to the retail presence of the respective luxury categories. Coach has 451 retail locations in the United Staes and by comparison, Louis Vuitton has 122 and Hermès has 36.

### Hermès in the United States

Hermès entered the US market in the 1930s and a Vogue advertisement for a store opening reads:

> Now in America – in New York. The famous shop of Hermès where his eminent American clientele most conveniently find those exclusive Hermès originations in fine leather which set the mode of Paris – the handbags, the luggage, the innumerable smart accessories – all under the distinguishing mark of the Hermès name which implies unmistak-ably a rare craftsmanship directed by creative supremacy.
>
> (Anon. 1930: 98)

Today, there are 27 directly owned Hermès stores in the United States and a handful of select *concessionaire* and licensed locations carrying smaller assort-ments of Hermès métier products (leather goods, handbags, scarves, ties). Hermès also sells wholesale product categories, which include fragrance, watches and tableware to luxury retailers like Saks Fifth Avenue, Nordstrom and Gumps.

In 2013, amidst strong financial gains in its US stores, Hermès began upgrading its presence in the United States with a larger Beverly Hills flagship store, and new off-mall locations for both its Atlanta (Buckhead) and Miami (Design District) stores (Edelson 2013). Co-CEO, Axel Dumas, commented that the United States, while already an 'established market', 'resembles an emerg-ing country' in terms of growth (Socha 2013: 1). The Americas region is the third largest market for Hermès (after Europe and Asia) and the United States has the most stores and revenue in the region. The current strategy for Hermès in the United States seemed concentrated on engaging its current customer base with a broader selection of its products (i.e. home goods) since Dumas also commented that the company would focus on increasing the size of its existing 27 stores instead of adding new ones (Socha 2013). Hermès also began to move away from the department store distribution model and closed all of its Neiman Marcus sales locations in 2012 (Hermès 2012). The stand-alone store is Hermès' main format in the United States and this is in contrast to the mall and depart-ment store locations more frequently used by Coach (Bernstein Research 2010).

Recent studies of luxury consumption by US consumers also suggest a stratification of luxury categories that aligns with the segmentation of acces-sible, aspirational and elitist luxury (Mintel 2011). Three groups that emerged from the research included *Exclusives*, *Taggers* and *Treaters*. The *Exclusives* segment had a perspective of luxury that most aligned with features of the Hermès brand, which included a definition of luxury as 'brands with a long-standing history of exclusivity and prestige', a greater tendency to associate luxury goods with craftsmanship and premium materials, and avoidance of obvious designer logos or patterns (Mintel 2011). This segment was also older than the other two (over 45 years old), had the highest income ($100K or more), and made up about 20% of the US population (United States Census Bureau 2013). In general, consumers with incomes of $75K were more likely to purchase luxury handbags, which ranked third after their luxury purchases

of clothing and beauty products (Mintel 2011). The same research also showed that the purchase of luxury handbags was highest among female consumers between the ages of 18 to 54, with 18 to 34 years olds slightly higher (39%) than women 35 to 54 years old (38%). Additional studies have shown that among US female consumers 18 to 25 years of age, handbags already symbolize status and a means of communicating self-image (Grotts and Johnson 2013).

While Hermès presents Equestrianism as the heart of its brand identity, and unit sales over time may show that silk is the most popular product, popular culture and media presents the Birkin bag as the undisputed icon of the Hermès brand (Boyd 2013). Most notable in US popular media is the television series *Sex and the City* and a specific episode titled, 'Shoulda, Woulda, Coulda' (Frankel 2001) from Season 4. In this episode one of the main characters, Samantha Jones, attempts to secure a $4000 red Togo style Birkin bag by deceitfully using actress Lucy Liu's name to move up the five-year waitlist. After the show aired, the notoriety of the Togo bag skyrocketed and since 2001, the bag has continued to rise in price annually (see Figure 1). Silverstein and Fiske discuss the influence of *Sex and the City* on the consumption of new luxury products and services in the US market noting that the show became a 'key influencer in certain categories of goods, particularly liquor, restaurants, clothing, jewelry, accessories and shoes' (2003: 42) with the greatest impact made on women's fashion. The Birkin's 'appearance' in the show is consistent with its historical association with celebrity, but it also created demand in the show's middle market audience looking to trade-up to the coveted bag.

The influence of *Sex and the City* on sales of the Birkin bag is also representative of the power of brand endorsers, which can include both unintended



Source: company sales history data

*Figure 1: Birkin 35 Togo Leather price, from 2001 to 2013.*

and unwanted endorsements. Endorsers can be in the form of *agents*, *semi-agents*, *Amazons*, *free movers* and *hi-jackers* (Radòn 2012). Celebrities can fall into any of the first three categories based on the manner in which the luxury brand supports the celebrity endorsement – ranging from advertisements (agents), free products (semi-agents), and wearers of the brand that are not affiliated via advertising or complimentary products (Amazons) (Radòn 2012). Celebrities may also be among the hi-jackers if they wear the luxury item in a manner that is inconsistent with the brand's image, and free movers are non-celebrity peers who wear the brand and may also introduce inconsistency if they veer from the brand's image. A different example of unintended (but perhaps not unwanted) endorsement is California designer Brian Lichtenberg. The designer has co-opted the Hermès name and logo for his Homiés streetwear line, and the brand enjoys a celebrity following as well as distribution in high-end retail stores. The parody streetwear brand has not yet been subject to trademark-related legal action from Hermès (Lipke 2013).

The association with celebrity or high-end retail does not provide complete immunity from the guardians of the Hermès brand. For example, the potential distribution of 'Jelly Kellys' (replicas of the iconic Kelly bag made in rubber) as wedding favours by Jennifer Lopez, led to a written request to abandon the gifting of the replicas by the law firm representing Hermès. The bags had also appeared in department stores like Henri Bendel and Lord & Taylor, which received cease-and-desist orders from the law firm. Hermès asserted that they were opposed to the exact replication of the bags with the inclusion of unique features that clearly define the Birkin bag's appearance, particularly the belt located at the top of the bag. This signature trademark was omitted from similar rubber replicas that were sold at Bloomingdale's and were subsequently not targeted for legal action by Hermès (Branch 2004).

### Allocating the Birkin bag

Despite the rumours of the 'waitlist' (or 'dream list') for a Hermès Birkin bag, it is no longer in existence in the United States. Though each Hermès store is free to manage its business as they see fit, most stores sell Birkin bags on a 'first come, first serve' basis. Many Hermès stores deliberately refrain from displaying Kelly and Birkin bags on the selling floor. Legally, store employees must sell anything that is on the floor. By keeping merchandise off of the floor, Hermès employees can selectively merchandise, or clientele, the bag. Because the demand is so high for the Birkin bag, Hermès store employees rely on customer relationship management and often clientele the bags to their best customers. An optimal Birkin purchaser would be a customer who is already a loyal Hermès client. As a client builds a reputation at a store through the acquisition of opening price point items such as silk, enamel bracelets and ready-to-wear, the client may find it easier to obtain the Birkin.

The Hermès store also serves as a point of customer relationship management around the bag and for the brand, and certain stores do take requests for specific bags. US store directors travel to the Paris market annually for purchasing and will try to place orders according to customer requests they have received. However, because production is so backed logged, the delivery of an ordered bag could take-over a year. It would be impossible to fill every direct request, but at least the store directors have an idea of what bags are in highest demand, and where to place their orders. Dana Thomas (2007) describes the bag ordering

process for Hermès clients and states that bags on view in the store are more like display models to present the client with options for a custom-ordered bag:

> You choose the material: cowhide, reptile, ostrich, or even canvas. You choose the color and the kind of hardware: silver, gold, diamond-encrusted. And for the Kelly, you choose if the seams are on the outside or turned in. And then you wait several months while it is made to your specifications.
>
> (2007: 172)

### Re-Distribution, resellers and counterfeits

The difficulty in obtaining a genuine Birkin bag has led to reselling and counterfeiting in certain markets and the United States is no exception. In 2012, an international counterfeit crime ring was uncovered by French police, involving the production of counterfeit Hermès bags with the help of several Hermès employees. The fraud was originally detected by the company's internal monitoring system and resulted in the discovery of hidden workshops filled with precious and rare leather skins. Dollar sales of the counterfeits by one branch of the ring were valued at $22 million (Diderich 2012a). In February of 2013, US Customs and Border Protection agents in Los Angeles seized two counterfeit shipments of Hermès bags imported from China worth $14.1 million (Ellis 2013).

This counterfeiting effect is not unique to Hermès, or luxury items, but occurs with many products demanded by consumers that are available in limited quantities and higher price points. Because of the extremely high rate of reselling and fake bags, Hermès has further restricted how it sells its iconic handbags. Now, each customer is only able to buy one Birkin or Kelly bag every six months (or two bags per year). While some (very, very important) customers are given special 'allowances' for multiple items, this is only after a thorough investigation of buying history has been completed. These practices are implemented not only to be able to offer more bags to more clients, but also, to eliminate the reselling and counterfeit production of the bag.

The Internet has become the most prolific channel for counterfeits and a US court even ordered 34 web sites selling counterfeit Hermès products to pay the company damages of $100 million. As a result of these incidents, Hermès Chief Executive, Patrick Thomas, commented that 80 per cent of goods sold on the internet under the Hermès name are not authentic (Diderich 2012b).

Genuinely authentic bags may also make their way into the resell market after owners sell or donate them. In the aftermath of the recession, consignment shops experienced an increase in inventory as consumers sold off their luxury items. Designer handbag reseller, Fashionpile in Beverly Hills (fashionpile.com), listed bags from Chanel, Louis Vuitton and Hermès as part of its secondhand inventory (Otay 2009). Bag leasing site, Bag, Borrow or Steal (bagborrowsteal.com) specializes in designer brands and occasionally makes direct requests to its subscribers for them to sell the company their Birkin and Kelly bags. The bags are either leased on its primary site (currently all Hermès bags have a waitlist) or sold via its Private Sale site. While Hermès cannot prevent this practice, it does raise concerns around counterfeiting. The issue of selling authentic bags to resellers is that these companies or individuals may distribute authentic bags alongside the counterfeits, and purchasers of authentic bags on the resell market will be able to create such intricate

replicas that not even a trained craftsman may be able tell the difference. The more bags they own, the more valid their copies become. Bag, Borrow or Steal provides a statement on its website to assure its subscribers that all of its merchandise has been verified for authenticity, but all sites on the Internet may not be so forthcoming (or legitimate).

## CONCLUSION

### *Hermès entry to the digital space/e-commerce*

Uche Okonkwo (2007) points out that e-commerce is a huge opportunity for luxury fashion brands but it can be challenging to recreate the exclusive, sensory nature of the luxury shop in the virtual environment. Hermès recognizes the importance of e-commerce and has adopted an approach that makes a limited range of products available for purchase online (Oknokwo 2007). Even though the company still limits the presence of many leather products on its website, including the elusive Birkin and Kelly bags, it serves as a great catalyst for introducing the mass market to the wide range of Hermès products. Currently, Hermès has extremely high goals for expanding the Internet division in all countries where its products are sold. The company recently entered the social media domain as it moves to attract a younger customer to the brand's opening price point products. Products include the Garden Party tote and Evelyne bag priced at around $2500 to $3500 (hermes.com).

By having a legitimate web presence, Hermès is also able to control its online sales and discourage counterfeiting. The hermes.com website is the only place that consumers can be sure that they are purchasing a genuine Hermès product on the Internet. Even the company's wholesale partners are not permitted to sell Hermès products online. While this strict control does not entirely address the problem of replicas available on the Internet, it is an essential approach to maintaining the image and integrity of the brand.

The availability of the Birkin bag in the US market is based on a carefully balanced determination of consumer demand, status and brand integrity. While waitlists are no longer a part of the Birkin bag purchase process, this does not imply immediate gratification for all consumers, particularly those new to the brand. Consumer loyalty, geographic location and purchase history across the Hermès brand are also contributors to gaining access to the limited inventory of Birkin bags. US consumers unable to obtain a bag through the limited domestic supply may also explore the various resellers (both online and offline) offering authentic previously owned Birkin styles, where prices are still remarkably high and inventories incredibly low. Scarcity in the marketplace has made the Hermès brand vulnerable to counterfeits and new luxury American brands also divert consumer spending to more accessible products. Nevertheless, the appeal of the Birkin lies in its handcrafted manufacture, refined association with heritage and status, as well as its elusive availability, ensuring that demand has not waned even in an uncertain global economy.

## REFERENCES

Anon. (1930), 'Advertisement: Hermès of Paris, Inc.', *Vogue*, 5 July, 76: 1, p. 98.
—— (2004), 'Last look: The Birkin 25', *Vogue*, 1 March, 194: 3, p. 604.
Apatoff, Alex (2010), 'Big Spender', *US Weekly*, 4 October, p. 16.

Managing an iconic old luxury brand in a new luxury economy

Bernstein Research (2010), 'Black book – European luxury goods: The anatomy of overseas luxury markets', http://search.ebscohost.com/login.aspx?direct=true&db=bth&AN=61232139&site=ehost-live. Accessed 9 October 2013.

Boyd, Annita (2013), 'Oh, honey! It's not so much the style, it's what carrying it means: Hermès bags and the transformative process', *Fashion, Style & Popular Culture*, 1: 1, pp. 81–96.

Branch, Shelly (2004), 'Style & substance: Hermès' jelly ache; rubbery copies of famed bag create a sticky situation; did cracking down fuel fad?', *Wall Street Journal*, 9 April, p. B.1.

Carreon, Blue (2012), 'Has the Hermès Birkin bag lost its appeal?', http://www.forbes.com/sites/bluecarreon/2012/07/17/has-the-hermes-birkin-bag-lost-its-appeal/. Accessed 20 December 2012.

Catry, Bernard (2003), 'The great pretenders: The magic of luxury goods', *Business Strategy Review*, 14: 3, pp. 10–17.

Danziger, Pamela N. (2005), *Let Them Eat Cake: Marketing Luxury to the Masses – As Well As to the Classes*, Chicago: Dearborn Trade Publishing.

Diderich, Joelle (2012a), 'Fake Hermès ring busted in France', *Women's Wear Daily*, 18 June, pp. 1, 12.

—— (2012b), 'Hermès Hails breakup of fake bag ring', *Women's Wear Daily*, 18 June, http://www.wwd.com/business-news/legal/herms-hails-breakup-of-fake-bag-ring-5966863. Accessed 2 December 2012.

—— (2012c), 'Keeping up with demand key for Hermès in "12"', *Women's Wear Daily*, 10 February, p. 2.

Dubois, Bernard and Duquense, Patrick (1993), 'The market for luxury goods: Income versus culture', *European Journal of Marketing*, 27: 1, pp. 35–44.

Edelson, Sharon (2013), 'Hermès making American push', *Women's Wear Daily*, 20 August, http://www.wwd.com/retail-news/designer-luxury/herms-american-spending-spree-7092916. Accessed 20 August 2013.

Ellis, Kristi (2013), '$14.1 M in Hermès fakes seized in L.A.', *Women's Wear Daily*, 7 March, http://www.wwd.com/business-news/government-trade/customs-in-seizure-of-1500-fake-herms-bags-6833954?src=search_links. Accessed 10 October 2013.

Frankel, David (2001), 'Coulda Woulda Shoulda', *Sex and the City*, Season 4, Episode 11, USA: HBO.

Grotts, Allie S. and Johnson, Tricia Widner (2013), 'Millenial consumer's status consumption of handbags', *Journal of Fashion Marketing & Management*, 17: 3, pp. 280–93.

Hermès (2012), '2012 annual report', http://finance.hermes.com/en/Reports-and Presentations/Annual-reports. Accessed 1 August 2013.

Jacobs, Laura (2007), 'From Hermès to eternity', *Vanity Fair*, September, http://www.vanityfair.com/culture/features/2007/09/hermes200709. Accessed 1 December 2012.

Lee, Melanie (2012), 'Louis Vuitton so last season for China's Super Chic', http://www.reuters.com/article/2012/06/07/us-china-luxury-idUS-BRE85602D20120607. Accessed 21 November 2012.

Leibstein, H. (1950), 'Bandwagon, snob, and Veblen effects in the theory of consumers' demand', *The Quarterly Journal of Economics*, 64: 2, pp. 183–207.

Lipke, David (2013), 'Designer parodies test legal boundaries in streetwear', *Women's Wear Daily*, 29 August, http://www.wwd.com/menswear-news/fashion/designer-parodies-test-legal-boundaries-in-streetwear-7103033?src=search_links. Accessed 29 August 2013.

177

Tasha L. Lewis | Brittany Haas

Milbank, Caroline (2005), 'Hermès', The Berg Fashion Library, http://www.bergfashionlibrary.com/view/bazf/bazf00299.xml. Accessed 8 December 2012.

Mintel (2011), 'Consumer attitudes toward luxury goods – US-march 2011', http://academic.mintel.com/display/543136/#. Accessed 26 September 2013.

Okonkwo, Uche (2007), *Luxury Fashion Branding*, New York: Palgrave Macmillan.

Otay, Anne-Marie (2009), 'Secondhand shops see uptick in sales', *Footwear News*, 1 June, http://www.wwd.com/footwear-news/markets/secondhand-shops-see-uptick-in-sales-2151911. Accessed 18 December 2012.

Radòn, Anita (2012), 'Unintended brand endorsers' impact on luxury brand image', *International Journal of Marketing Studies*, 4: 1, pp. 108–15.

Rath, Patricia Mink, Petrizzi, Richard and Gill, Penny (2012), *Marketing Fashion: A Global Perspective*, New York: Fairchild Books.

Silverstein, Michael J. and Fiske, Neil (2003), *Trading Up: The New American Luxury*, New York: Penguin.

Socha, Miles (2013), 'Hermès bullish on America', *Women's Wear Daily*, 3 September, http://www.wwd.com/business-news/forecasts-analysis/hermes-bullish-on-america-7105987?src=search_links. Accessed 3 September 2013.

Thomas, Dana (2007), *Deluxe: How Luxury Lost Its Luster*, New York: Penguin.

United States Census Bureau (2013), 'Historical income tables: Households', http://www.census.gov/hhes/www/income/data/historical/. Accessed 10 October 2013.

Vigneron, Franck and Johnson, Lester W. (1999), 'A review and conceptual framework of prestige-seeking consumer behavior', *Academy of Marketing Science Review*, 1999: 1, pp. 1–15.

Warren, Marcus (2004), 'Martha Stewart goes to court in high style: Totes $7,800 bag for jury selection', *National Post*, 23 January, p. A12.




## CONTRIBUTOR DETAILS

Tasha L. Lewis (Ph.D.) is an Assistant Professor in the Department of Fiber Science & Apparel Design at Cornell University. Her current research involves fashion brand management, sustainability in the apparel supply chain, and consumer-facing fashion technologies. Tasha Lewis is the corresponding author.

Brittany Haas graduated from Cornell University with a degree in Fiber Science & Apparel Design. She has worked at top luxury and designer brands including Ralph Lauren, Saks Fifth Avenue and Hermès where her current role is the Hermès of Paris USA Merchandise Manager.

Contact: Cornell University, College of Human Ecology, Department of Fiber Science & Apparel Design, 37 Forest Home Drive, Ithaca, NY 14853, USA.
E-mail: tll28@cornell.edu

Tasha L. Lewis and Brittany Haas have asserted their right under the Copyright, Designs and Patents Act, 1988, to be identified as the authors of this work in the format that was submitted to Intellect Ltd.