Joshua H. Haffner, SBN 188652
 jhh@haffnerlawyers.com
Alfredo Torrijos, SBN 222458
 at@haffnerlawyers.com
Vahan Mikayelyan, SBN 337023
 vh@haffnerlawyers.com
HAFFNER LAW PC
15260 Ventura Blvd., Suite 1520
Sherman Oaks, California 91403
Tel: (213) 514-5681 / Fax: (213) 514-5682

Shaun C. Setareh, SBN 204514
 shaun@setarehlaw.com
Thomas A. Segal, SBN 222791
 thomas@setarehlaw.com
SETAREH LAW GROUP
9665 Wilshire Blvd., Suite 430
Beverly Hills, California 90212
Tel: (310) 888-7771 / Fax: (310) 888-0109

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TINA CAVALLERI, an individual; MARK GLINOGA, an individual; MENGYAO YANG, an individual; on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>HERMÈS INTERNATIONAL, a French corporation and HERMÈS OF PARIS, INC., a New York corporation, and DOES 1 through 10; inclusive,<br><br>    Defendants. | Case No. 3:24-CV-01707-JD<br><br>HON. JAMES DONATO<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**<br><br><u>Hearing</u><br>Date: January 30, 2025<br>Time: 10:00 a.m.<br>Dept: 11 – 19th Floor |

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................................1

II.  BACKGROUND AND RELEVANT FACTUAL ALLEGATIONS..............................1

III. ARGUMENT ........................................................................................................................2

    A.    Plaintiffs Have Sufficiently Pleaded Sherman Act Claims....................................2

        1.    Plaintiffs Have Defined a Viable Market........................................................2

        2.    Plaintiffs Have Alleged Market Power in the Relevant Market .................4

        3.    Plaintiffs Have Alleged Antitrust Injury .......................................................6

    B.    Plaintiffs' State Law Claims Are Adequately Pleaded ...........................................9

        1.    Plaintiffs Have Properly Pleaded Cartwright Act Violations .....................9

        2.    Plaintiffs' Claims for FAL, Fraud, and Negligent Misrepresentation ........10

        3.    Plaintiffs Have Properly Stated Claims Under the Unfair Competition Law...................................................................................................13

IV. CONCLUSION ...................................................................................................................15

– i –

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED CLASS ACTION COMPLAINT (CASE NO. 3:24-CV-01707-JD)**

# TABLE OF AUTHORITIES

**Cases**

*Amarel v. Connell*
    102 F.3d 1494 (9th Cir. 1996) ................................................................................. 8

*Apple Inc. v. Pepper*
    139 S. Ct. 1514, 1521 (2019) ............................................................................... 4, 6

*Brown Shoe Co. v. United States*
    370 U.S. 294 (1962) ............................................................................................... 2

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
    429 U.S. 477 (1977) ............................................................................................... 7

*Cascade Health Solutions v. PeaceHealth*
    515 F.3d 883 (9th Cir. 2008) ............................................................................... 8, 9

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*
    504 U.S. 451 (1992) ........................................................................................ 3, 5, 9

*FTC v. Indiana Fed'n of Dentists*
    476 U.S. 447 (1986) ............................................................................................... 5

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*
    386 F.3d 485 (2d Cir. 2004) .................................................................................. 6

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*
    352 F.3d 367 (9th Cir. 2003) ............................................................................... 7, 9

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*
    466 U.S. 2 (1984) ................................................................................................... 8

*Knevelbaard Dairies v. Kraft Foods, Inc.*
    232 F.3d 979 (9th Cir. 2000) ............................................................................... 7, 9

*Rebel Oil Co. v. Atl. Richfield Co.*
    51 F.3d 1421 (9th Cir. 1995) ............................................................................... 4, 8

*Spirit Airlines, Inc. v. Northwest Airlines, Inc.*
    431 F.3d 917 (6th Cir. 2005) ................................................................................. 5

*United States v. Microsoft Corp.*
    253 F.3d 34 (D.C. Cir. 2001) ................................................................................ 5

## I. INTRODUCTION

Plaintiffs oppose defendants Hermès of Paris, Inc. and Hermès International's ("Defendants" or "Hermès") motion to dismiss the Second Amended Complaint ("SAC") on the grounds that Plaintiffs have adequately pleaded all claims. Plaintiffs assert that Hermès has abused its market power by conditioning the purchase of highly sought-after Birkin handbags on the purchase of additional Hermès products, thus engaging in an illegal tying scheme. This conduct violates federal and state antitrust laws and harms consumers. The motion to dismiss should be denied.

## II. BACKGROUND AND RELEVANT FACTUAL ALLEGATIONS

The Birkin handbag symbolizes wealth, exclusivity, and craftsmanship. Hermès creates scarcity by limiting production and restricting access, leveraging this exclusivity to engage in alleged anticompetitive practices. Customers cannot simply purchase a Birkin; only "worthy" individuals selected by Hermès sales associates, based on purchase history, are offered the opportunity. This policy forces consumers to spend thousands on unrelated Hermès products to qualify for a Birkin, incentivized by a commission structure favoring non-Birkin sales. [SAC, ¶¶ 22, 42-45.]

Plaintiffs allege Hermès employs a "tying" scheme, coercing customers into purchasing ancillary products to access a Birkin. Plaintiff Tina Cavalleri spent over $10,000 on Hermès goods but was denied a Birkin, illustrating the exploitative and unpredictable nature of this practice. Similarly, Plaintiff Mengyao Yang spent over $10,000 but was told further purchases were needed to qualify, exemplifying Hermès' financial manipulation. [SAC, ¶¶ 43-55.]

Hermès dominates the "elitist luxury handbag" market, holding an estimated 60-75% share. Its intentional scarcity strategy enhances market power, enabling anticompetitive tying arrangements without losing consumer interest. Reports recognize Hermès' economic influence, with Birkin bags serving as status symbols and investments. [SAC, ¶¶ 32-34.]

Plaintiffs claim Hermès misleads consumers by not disclosing that ancillary purchases are required to obtain a Birkin. Despite promotional materials suggesting availability, Hermès sales associates reinforce this deception through verbal misrepresentations. Customers are told that buying more unrelated items increases their chances of purchasing a Birkin, yet many are ultimately denied. This lack of transparency constitutes false advertising, deception, and anticompetitive behavior. [SAC, ¶¶ 122-125.]

– 1 –

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT (CASE NO. 3:24-CV-01707-JD)**

## III. ARGUMENT

### A. Plaintiffs Have Sufficiently Pleaded Sherman Act Claims.

#### 1. *Plaintiffs Have Defined a Viable Market.*

Defendants argue that Plaintiffs' market definitions are artificially narrow, failing to encompass all reasonable substitutes. However, Plaintiffs' SAC adequately defines a relevant tying market for "elitist luxury handbags" based on unique characteristics: Hermès, Chanel, and similar brands provide limited-supply, high-price products crafted from the highest quality materials with a reputation for exclusivity. [SAC, ¶26.] The Birkin bag is an icon within this category due to its recognized value as a collectible, the meticulous craftsmanship involved, and Hermès' strategic limitations on its availability. [SAC, ¶¶23-24.] These distinct attributes justify a "submarket" within the broader luxury handbag market, as recognized in *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), where the Supreme Court acknowledged that well-defined submarkets may constitute relevant markets.

Plaintiffs distinguish "elitist luxury handbags" from the "aspirational" or "accessible" markets where brands like Louis Vuitton, Gucci, and Michael Kors reside. While luxury, these brands lack the same combination of scarcity, prestige, and "investment potential" attributed to Hermès, Chanel, and other high-end products. [SAC, ¶¶27-28.] The SAC further justifies its market definition by citing sources recognizing tiers within luxury markets, reinforcing that Hermès, Chanel, and Bottega Veneta occupy an exclusive category within the luxury handbag landscape.

Courts recognize that market definitions need only be plausible at the pleading stage and can include submarkets when justified by distinct characteristics. The Supreme Court in *Brown Shoe,* established that submarkets can be appropriate when supported by "practical indicia" such as "industry or public recognition, peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Plaintiffs' definition of an "elitist luxury handbag" market is supported by precisely these characteristics, as discussed in the SAC, and thus meets the standard for a viable market at the pleading stage.

#### a) Practical Indicia Supporting a Submarket.

Plaintiffs describe a distinct "elitist luxury handbag" market that includes only brands like Hermès and Chanel, based on unique characteristics that distinguish these brands from "aspirational" or "accessible"

– 2 –

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT (CASE NO. 3:24-CV-01707-JD)**

luxury brands, such as Louis Vuitton or Gucci. [SAC, ¶¶ 26-27.] This narrower market definition is justified by:

**Unique Characteristics and Uses:** The Birkin handbag and comparable products from brands like Chanel are produced in extremely limited quantities, priced in tens of thousands of dollars, and treated as collectible items with resale values that often exceed their original prices. [SAC, ¶¶ 30-31.] These attributes set them apart from bags offered by aspirational brands, which lack the exclusivity and "investment value" associated with the elitist market.

**Distinct Customers and Sensitivity to Price Changes:** Consumers in the elitist luxury handbag market demonstrate unique behaviors, such as low sensitivity to price increases and a willingness to undergo waiting periods or spend significant sums on ancillary products to gain access to these high-end items. [SAC, ¶ 32.] This consumer base is generally affluent, less price-sensitive, and driven by the exclusivity and prestige associated with Hermès, which aligns with the factors supporting a distinct submarket as outlined in *Brown Shoe*.

**Industry Recognition and Resale Value:** Industry publications and market studies recognize that brands like Hermès and Chanel occupy a unique tier within the luxury market due to their limited availability and the resale value of products like the Birkin bag. [SAC, ¶ 27.] The SAC further notes that approximately 73% of secondhand handbags priced over $20,000 are Hermès bags, underscoring the distinctiveness and market dominance of Hermès in this niche. [SAC, ¶ 31.]

Together, these factors establish that Hermès and similar brands constitute a distinct submarket within the broader luxury handbag market, justifying Plaintiffs' narrower definition. Courts have upheld similar submarket definitions where practical indicia distinguish a subset of products from the broader market. In *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992), the Court accepted a market definition limited to Kodak parts and services because of Kodak's unique market control and consumer dependency. Likewise, Hermès' market power and the exclusive demand for Birkin bags set them apart as a valid submarket.

### b) Plausibility of Plaintiffs' Market Definition at the Pleading Stage

At the pleading stage, courts accept plausible market definitions, even if the ultimate market determination is deferred to a later stage. Plaintiffs' market definition satisfies the pleading standard as it is

– 3 –

consistent with industry-recognized distinctions in luxury markets and is supported by specific factual allegations regarding consumer behavior and market structure. Courts have upheld similarly tailored market definitions where evidence of brand loyalty, unique characteristics, and exclusive distribution methods creates a distinct submarket. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) (upholding distinct markets for app distribution due to Apple's control over supply and pricing).

Plaintiffs' definition of an elitist luxury handbag market aligns with established precedent for recognizing submarkets and overcomes Defendants' objections regarding narrowness by identifying specific characteristics and consumer behaviors that distinguish this market from the broader luxury handbag market. This provides a legally sound basis for allowing Plaintiffs to proceed with their claims.

### 2. *Plaintiffs Have Alleged Market Power in the Relevant Market*

Defendants argue that Plaintiffs have not demonstrated Hermès' market power within the relevant market, but this argument is premature at the pleading stage. Plaintiffs have adequately alleged market power by asserting that Hermès controls 60-75% of the elitist luxury handbag market – a level considered to indicate substantial market power, particularly in a narrowly defined market. [SAC, ¶ 32.] Plaintiffs' market power allegation is based on Hermès' control over the supply and distribution of the Birkin bag, an iconic product in extraordinarily high demand.

Furthermore, Plaintiffs allege that the limited supply of Birkin bags enhances Hermès' control over this market. By restricting production and limiting consumer access to these products, Hermès amplifies the exclusivity and appeal of the Birkin, which is why it commands such a significant share of the high-end luxury market. At the pleading stage, Plaintiffs' market power allegations are more than sufficient and will be further supported through discovery. Courts have repeatedly held that, at the pleading stage, detailed economic proof of market power is not required. Rather, plaintiffs must allege facts that make it plausible that the defendant has substantial control over pricing or supply within the relevant market. In this case, Plaintiffs' allegations regarding Hermès' market share, pricing control, and supply restrictions satisfy the pleading standard for market power.

#### a) Market Share as Evidence of Market Power

Market power is typically established through evidence of a dominant market share. In *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995), the Ninth Circuit held that a market share of 30% may be

– 4 –

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT (CASE NO. 3:24-CV-01707-JD)**

sufficient to infer market power if accompanied by "other evidence of anticompetitive behavior." Here, Plaintiffs allege that Hermès controls a significant portion of the elitist luxury handbag market – between 60% and 75% – which easily surpasses the threshold recognized by courts for inferring market power at the pleading stage. [SAC, ¶32.] In *Eastman Kodak, supra,* 504 U.S. at 481, the Supreme Court held that Kodak's "significant share" of the relevant market was sufficient to raise a plausible inference of market power, even absent specific data on elasticity or other economic factors. Similarly, Hermès' alleged market share strongly suggests a dominant position within this highly specialized luxury market.

Moreover, Hermès' control over such a large share of this narrowly defined market allows it to set prices, restrict supply, and engage in the allegedly anticompetitive practices described in the SAC without risk of losing market share to competitors. Courts have recognized that when a defendant holds a substantial market share in a specialized market, there is a presumption of market power. *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986) (finding that market power can be inferred when a firm can restrict output or control prices).

### b) Hermès' Control Over Pricing and Supply as an Indicator of Market Power

Plaintiffs allege that Hermès exercises substantial control over both the pricing and availability of Birkin handbags, reinforcing its market power. In *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001), the court held that market power may be inferred from the ability to control output or exclude competitors. Here, Hermès allegedly limits the supply of Birkin handbags to maintain their exclusivity and high resale value, thereby exerting substantial control over the market for elitist luxury handbags. [SAC, ¶ 22.] Plaintiffs further allege that Hermès selectively determines which customers may access Birkin bags, conditioning eligibility on extensive purchases of ancillary products. This control over both supply and access provides Hermès with the ability to raise prices or restrict output without fear of losing customers to other luxury brands.

Courts have acknowledged that the ability to influence pricing or availability within a market is an indicator of market power. In *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 935 (6th Cir. 2005), the Sixth Circuit found that evidence of market power included the defendant's ability to maintain high prices and restrict capacity. Likewise, Hermès' practices align with these indicators, as its pricing and supply restrictions for Birkin bags create a scarcity that allows the company to demand high prices and

impose additional conditions on buyers.

### c) Consumer Demand and Brand Loyalty as Reinforcing Market Power

Courts have also considered consumer loyalty and brand appeal as factors supporting a finding of market power. In *Apple Inc. v. Pepper*, *supra*, 139 S.Ct. at 1519-21, the Supreme Court recognized that Apple's control over its app distribution system, combined with high consumer demand, provided it with market power. Similarly, Hermès' Birkin handbags have an unparalleled brand appeal and customer demand that reinforces its dominant position in the elitist luxury handbag market. [SAC, ¶25.] This loyalty enables Hermès to impose purchase conditions on consumers without losing demand, as customers are willing to make extensive purchases of other Hermès products to qualify for a Birkin.

Additionally, in *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 497 (2d Cir. 2004), the court found that consumer preference for a specific brand can indicate market power when consumers are unlikely to switch to alternatives. Hermès' brand loyalty is evidenced by its ability to compel consumers to buy ancillary products to access a Birkin. Plaintiffs allege that this loyalty and demand allow Hermès to engage in tying practices without diminishing demand, supporting the inference of market power based on consumer loyalty alone.

At the pleading stage, Plaintiffs are not required to prove Hermès' market power conclusively but to allege facts that make it plausible. The alleged 60-75% market share, along with Hermès' control over pricing, supply, and consumer access to Birkin bags, supports a plausible inference that Hermès holds substantial market power within the elitist luxury handbag market. Courts have routinely held that dominant market share, coupled with control over pricing and output, is sufficient to establish market power at this stage. Plaintiffs have therefore met their burden by providing specific, factual allegations consistent with established case law, warranting denial of the motion to dismiss.

### 3. *Plaintiffs Have Alleged Antitrust Injury*

Defendants argue that Plaintiffs have failed to allege an antitrust injury, but this argument misinterprets the nature of Plaintiffs' claims. Antitrust injury is the harm to competition or consumer welfare caused by anticompetitive conduct, and it is a required element to sustain antitrust claims. The Supreme Court has clarified that to establish antitrust injury, a plaintiff must show "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v.*

– 6 –

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT (CASE NO. 3:24-CV-01707-JD)**

*Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Here, Plaintiffs have alleged that Hermès' tying arrangement limits consumer choice, inflates prices, and restricts competition, resulting in direct consumer harm and satisfying the antitrust injury requirement.

At the pleading stage, courts in the Ninth Circuit accept plausible allegations of antitrust injury without requiring detailed economic proof.  In *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000), the Ninth Circuit held that antitrust injury need only be plausible at the outset and need not be supported by economic data until later stages of the litigation. Plaintiffs here allege facts indicating that Hermès' tying arrangement limits consumer choice, inflates prices, and restricts competition in the tied product market—all recognized forms of antitrust injury under Supreme Court and Ninth Circuit precedent.

Moreover, in *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003), the court held that allegations of "higher prices and reduced consumer choice" sufficiently state an antitrust injury. Plaintiffs have met this standard by alleging that Hermès' conduct results in higher prices for consumers and restricts their choice of luxury accessories. Plaintiffs' allegations align closely with the types of consumer harm the antitrust laws are designed to prevent, supporting the plausibility of antitrust injury at this stage.

The SAC outlines clear and specific anticompetitive harms.  Hermès has allegedly coerced customers into purchasing items they did not want or could have purchased from competitors by making such purchases a condition for obtaining a Birkin bag.  This restriction in consumer choice – forcing consumers to either purchase ancillary items from Hermès or forfeit the opportunity to buy a Birkin bag – demonstrates how Hermès' conduct forecloses competition in the luxury accessories and apparel market. [SAC, ¶¶53-56.]  Furthermore, Plaintiffs allege that Hermès' tying arrangement inflates prices in both the tying and tied product markets.  This constitutes antitrust injury under the Sherman Act, as consumers are harmed by the restriction of competition and inflated costs.  These injuries are precisely the type that antitrust laws are designed to prevent, making dismissal inappropriate.

### a) Consumer Harm and Limited Choice

Courts recognize that coercive tying arrangements, which force consumers to purchase unwanted or unnecessary products as a condition of purchasing the desired product, can constitute antitrust injury because they limit consumer choice and harm competition.  In *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,

– 7 –

466 U.S. 2 (1984), the Supreme Court held that tying arrangements can have "pernicious effects on competition" by foreclosing consumer choice in the tied product market. Plaintiffs allege that Hermès' conduct restricts consumer choice by conditioning access to Birkin handbags on the purchase of additional, non-Birkin Hermès products. Specifically, Plaintiffs allege they were required to spend thousands of dollars on Hermès' ancillary products to qualify for the opportunity to purchase a Birkin bag, effectively compelling them to buy products they did not want or could have purchased elsewhere. [SAC, ¶¶53-55.] This restriction on consumer choice, directly resulting from Hermès' tying arrangement, constitutes antitrust injury under *Jefferson Parish*.

In the Ninth Circuit, antitrust injury has also been recognized when consumers are harmed by diminished choice and inflated prices resulting from a defendant's conduct. In *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 902 (9th Cir. 2008), the Ninth Circuit acknowledged that antitrust injury may occur when a firm's conduct prevents consumers from freely choosing between competing products. Here, Hermès' practices limit consumers' freedom to select other luxury accessory products from competitors such as Chanel or Louis Vuitton, as consumers are compelled to purchase Hermès products to gain access to the Birkin. This coerced limitation on consumer choice, combined with inflated costs resulting from the tying arrangement, aligns with the Ninth Circuit's standard for antitrust injury.

### b) Financial Harm Due to Supracompetitive Prices

The Ninth Circuit has held that plaintiffs may allege antitrust injury by showing that the defendant's conduct led to artificially high prices. In *Amarel v. Connell*, 102 F.3d 1494, 1508 (9th Cir. 1996), the court recognized that artificially inflated prices stemming from anticompetitive behavior are a form of antitrust injury. Plaintiffs here allege that Hermès' tying arrangement inflates the true price of Birkin handbags. Because Hermès requires consumers to purchase a substantial amount of ancillary products to qualify for the opportunity to buy a Birkin bag, the "effective" price of a Birkin bag is often significantly higher than the advertised retail price. [SAC, ¶56.] This scheme effectively raises the price consumers pay, creating economic harm and diminishing competition in the luxury handbag market.

The Ninth Circuit also held in *Rebel Oil Co., supra,* 51 F.3d at 1433, that inflated prices resulting from monopolistic practices constitute antitrust injury. Here, Hermès allegedly maintains inflated prices for both the tying and tied products, as consumers are compelled to buy ancillary products at premium prices to

– 8 –

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT (CASE NO. 3:24-CV-01707-JD)**

qualify for a Birkin. The inflated costs due to the tying arrangement are borne directly by consumers and are precisely the type of injury that the antitrust laws were designed to prevent.

### c) Foreclosure of Competition in the Tied Product Market

Plaintiffs also allege that Hermès' conduct forecloses competition in the luxury apparel and accessories market, as consumers who might otherwise purchase from competitors are compelled to buy Hermès products to qualify for a Birkin. The Supreme Court has noted that tying arrangements harm competition when they "foreclose competitors from any substantial market." *United States v. Loew's, Inc.*, 371 U.S. 38, 45 (1962). In *Kodak*, the Supreme Court held that tying arrangements harm competition by restricting consumer choice and reinforcing the defendant's market power, potentially foreclosing rivals in the tied market. *Eastman Kodak Co.*, supra, 504 U.S. at 463.

Plaintiffs allege that by compelling consumers to purchase Hermès' ancillary products as a condition of access to Birkin handbags, Hermès' conduct prevents consumers from purchasing these types of luxury accessories from competitors like Chanel or Louis Vuitton. [SAC, ¶47.] This foreclosure of competitors harms competition in the luxury accessories market by diverting sales to Hermès that would otherwise benefit rival brands. As in *Eastman Kodak*, Hermès' market power in the elitist luxury handbag market allows it to impose tying requirements, effectively foreclosing competition in the ancillary luxury goods market. This market foreclosure deprives consumers of competitive options, constituting an injury to competition and supporting Plaintiffs' claim of antitrust injury.

Plaintiffs have plausibly alleged an antitrust injury by demonstrating harm to consumer choice, inflated prices, and the foreclosure of competition in the luxury goods market. These allegations are consistent with the Ninth Circuit's standard for pleading antitrust injury, as established in cases such as *Cascade Health*, *Knevelbaard Dairies*, and *Glen Holly Entertainment*. The alleged injury directly stems from Hermès' tying arrangement, which restricts competition, harms consumers, and reinforces Hermès' market dominance. These allegations satisfy the requirement for antitrust injury, making dismissal of Plaintiffs' claims on this basis inappropriate.

### B. Plaintiffs' State Law Claims Are Adequately Pleaded

#### 1. *Plaintiffs Have Properly Pleaded Cartwright Act Violations*

The Cartwright Act, California's primary antitrust statute, broadly prohibits tying arrangements that

– 9 –

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT (CASE NO. 3:24-CV-01707-JD)**

harm competition and restrict consumer choice. It is modeled after the Sherman Act but construed more broadly to protect California consumers. See *Marin Cnty. Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 925 (1976). Plaintiffs allege that Hermès violates the Cartwright Act by requiring consumers to purchase ancillary products (the tied products) to qualify for a Birkin bag (the tying product), leveraging its market dominance in the luxury handbag market. [SAC, ¶¶ 43-45.]

California courts recognize tying claims when market power in the tying product compels tied-product purchases, as in *Morrison v. Viacom, Inc.*, 52 Cal. App. 4th 1514, 1523 (1997). Plaintiffs allege Hermès controls 60-75% of the elitist luxury handbag market, enabling it to impose tying conditions without losing demand. [SAC, ¶¶ 32, 47.] Such practices restrict competition and consumer choice, satisfying the Cartwright Act's standards. [SAC, ¶¶ 43-45.]

The Ninth Circuit and California courts have also held that tying schemes violating the Cartwright Act can foreclose competition in tied markets. See *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 988-89 (N.D. Cal. 2010). Plaintiffs allege Hermès' tying scheme forces consumers to divert spending from competitors like Chanel and Louis Vuitton, foreclosing competition and harming the tied market. [SAC, ¶ 47.]

California's Cartwright Act provides broader protections than federal law. Unlike the Sherman Act, it focuses on direct harm to consumers and competition, as noted in *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 788 (2010), and *Carter v. Variflex, Inc.*, 101 Cal. App. 4th 425, 432 (2002). Plaintiffs' allegations meet these standards by showing Hermès restricts consumer choice, compels unnecessary purchases, and inflates the true cost of a Birkin bag. [SAC, ¶¶ 44, 56.]

Finally, tying schemes that exploit market power to impose financial burdens are condemned under California law. See *Redwood Theatres, Inc. v. Festival Enterprises, Inc.*, 200 Cal. App. 3d 687, 705 (1988). Plaintiffs allege Hermès' sales associates are incentivized to push ancillary products through a commission structure, exploiting the Birkin bag's desirability to artificially inflate sales of tied products. [SAC, ¶¶ 44, 56.]

### 2.   *Plaintiffs' Claims for FAL, Fraud, and Negligent Misrepresentation*

#### a) False Advertising Claims Under California's False Advertising Law (FAL)

Under California's False Advertising Law (FAL), Cal. Bus. & Prof. Code § 17500, it is unlawful for

any business to make or disseminate statements that are untrue or misleading and likely to deceive consumers. The FAL does not require proof of actual deception but focuses on whether a reasonable consumer is likely to be misled by the advertising. *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002). Here, Plaintiffs allege that Hermès falsely represented the Birkin bag as being "available," without disclosing the conditions that Hermès allegedly imposes on consumers before they can buy one. [SAC, ¶122.] Hermès' marketing materials and online representations implied that customers could purchase a Birkin bag if they wished, when in reality, Hermès required consumers to make substantial purchases of other products to qualify for the opportunity to buy a Birkin. This lack of disclosure is deceptive because a reasonable consumer would likely believe that purchasing a Birkin does not depend on unrelated transactions, as alleged in the SAC. The Northern District of California has held that false advertising claims are sufficiently pleaded when the plaintiff alleges specific misrepresentations that are likely to mislead a reasonable consumer. In *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1075-76 (N.D. Cal. 2011), the court found that allegations that Apple misrepresented the availability of an "unlimited" data plan for iPad customers were sufficient to state a claim under the FAL, as Apple failed to disclose significant limitations. Similarly, Hermès' representations regarding the availability of Birkin bags, coupled with its failure to disclose the conditions on access to those bags, plausibly mislead consumers and meet the pleading standard for FAL claims.

### b) Fraud Claims and the Standard for Intentional Misrepresentation

To state a claim for fraud under California law, a plaintiff must allege: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity; (3) intent to induce reliance; (4) justifiable reliance by the plaintiff; and (5) resulting damage. *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996). While fraud claims require specificity, this requirement is relaxed where the details are within the exclusive knowledge of the defendant. See *Tarmann v. State Farm Mut. Auto. Ins. Co.*, 2 Cal.App.4th 153, 158 (1991).

Plaintiffs allege that Hermès misrepresented both the availability of the Birkin bag and the conditions required to purchase one. Hermès' sales associates allegedly told customers that buying additional Hermès products would guarantee or increase their chances of obtaining a Birkin, even though this was untrue. [SAC, ¶¶53-54.] Hermès' intent to induce reliance is evident, as the misrepresentations are aimed at

– 11 –

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT (CASE NO. 3:24-CV-01707-JD)**

encouraging customers to spend substantial sums on ancillary products.

California courts have recognized similar allegations as sufficient to state a claim for fraud. In *Consumer Advoc. Grp., Inc. v. Kintetsu Enters. of Am.*, 141 Cal.App.4th 46, 64 (2006), the court found that allegations that a hotel misrepresented its "non-smoking" policy to consumers were sufficient to support a fraud claim, as the statements were likely to induce consumers to rely on the hotel's representations when booking rooms. Here, Hermès allegedly made misleading statements and omitted material facts, knowing that consumers would rely on these representations to make purchasing decisions. This reliance resulted in financial harm, as Plaintiffs made substantial purchases of ancillary products based on Hermès' misrepresentations.

Federal courts, including the Northern District of California, have similarly held that intentional misrepresentation claims can proceed when plaintiffs allege a deliberate failure to disclose material conditions, as Hermès did. In *Doe v. SuccessfulMatch.com*, 70 F.Supp.3d 1066, 1074 (N.D. Cal. 2014), the court held that fraudulent inducement claims were adequately pleaded where plaintiffs alleged that the defendant failed to disclose critical information, resulting in a misleading impression. Likewise, Hermès' failure to disclose the true conditions for purchasing a Birkin bag supports a claim for fraud by creating a misleading impression about the product's availability.

### c) Negligent Misrepresentation

Under California law, a claim for negligent misrepresentation requires a showing that: (1) the defendant made a representation without reasonable grounds for believing it to be true; (2) the representation was made to induce reliance; (3) the plaintiff justifiably relied on the representation; and (4) the plaintiff suffered damages. *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 407-08 (1992).

Plaintiffs allege that Hermès' statements, made by its sales associates, led them to reasonably believe that purchasing additional Hermès products would secure or increase their chances of obtaining a Birkin bag. [SAC, ¶¶ 53-55.]  Given Hermès' control over the supply of Birkin bags and the special status they hold, these representations were made without reasonable grounds and were likely to induce consumer reliance. Plaintiffs justifiably relied on these representations and suffered financial harm when they purchased items they did not want or need solely to improve their chances of obtaining a Birkin.

California courts have upheld negligent misrepresentation claims under similar circumstances where a

– 12 –

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT (CASE NO. 3:24-CV-01707-JD)**

defendant's statements misled consumers into believing that they needed to make certain purchases. In *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal.App.4th 226, 243 (2007), the court held that a misrepresentation claim was adequately stated where plaintiffs alleged that the defendant made statements inducing them to invest based on misrepresented conditions. Here, Hermès' statements and omissions regarding the purchasing conditions for a Birkin bag similarly induced Plaintiffs to spend significant amounts on other Hermès products under the belief that it would improve their chances of buying a Birkin.

Federal courts, including those in the Northern District, have likewise found that negligent misrepresentation claims are sufficiently pleaded when the defendant has exclusive control over information that could correct the misrepresentation. In *Hopper v. Banana Republic, LLC*, 528 F.Supp.3d 1107, 1113 (N.D. Cal. 2021), the court held that allegations regarding misleading discount pricing practices were sufficient to state a claim for negligent misrepresentation. Here, Hermès' exclusive control over the Birkin bag's availability and its communications through sales associates support Plaintiffs' claim that Hermès had a duty to provide accurate information, but failed to do so.

### 3. *Plaintiffs Have Properly Stated Claims Under the Unfair Competition Law*

California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 et seq., prohibits business practices that are unlawful, unfair, or fraudulent. Plaintiffs allege that Hermès' conduct constitutes unfair competition under all three prongs of the UCL.

#### a) The "Unlawful" Prong of the UCL

The "unlawful" prong of the UCL borrows from other laws, meaning a practice is unlawful if it violates any other state or federal statute. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999). Plaintiffs allege that Hermès violated California's False Advertising Law (FAL) and the Cartwright Act through its conduct, including the tying arrangement and deceptive representations about Birkin bag availability. [SAC, ¶¶125-128.] Because each of these alleged violations constitutes an unlawful act under California law, Hermès' conduct is also actionable under the "unlawful" prong of the UCL. District courts in California, including the Northern District, have consistently held that a violation of any predicate law suffices to state a claim under the UCL's "unlawful" prong. In *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F.Supp.2d 1070, 1077 (N.D. Cal. 2011), the court found that alleged violations of the FAL,

– 13 –

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT (CASE NO. 3:24-CV-01707-JD)**

coupled with misleading advertising practices, were sufficient to state a UCL claim under the "unlawful" prong. Here, Plaintiffs have alleged predicate violations under the Cartwright Act and FAL, each of which supports their claim under the UCL.

### b) The "Unfair" Prong of the UCL

The "unfair" prong of the UCL prohibits business practices that violate established public policy or are "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Cel-Tech*, 20 Cal.4th at 182-83. Courts in California have adopted different tests for assessing "unfair" practices under the UCL, often weighing factors such as the harm to consumers against the utility of the defendant's conduct, especially where consumer protection is concerned. Plaintiffs allege that Hermès' practice of conditioning access to Birkin bags on purchases of other Hermès products is inherently unfair because it coerces consumers to spend thousands of dollars on products they may not want or need simply to qualify for the chance to buy a Birkin bag. [SAC, ¶¶47-50.] This practice exploits Hermès' market power, depriving consumers of the free choice that is central to fair competition and harming consumers who feel pressured into excessive purchases.

California courts have found that coercive practices that exploit consumers' desire for a particular product are sufficient to state a claim under the "unfair" prong of the UCL. In *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal.App.4th 700, 720 (2001), the court held that an insurer's practice of requiring certain conditions that benefitted the company at the expense of consumers constituted an unfair practice under the UCL. Similarly, Hermès' leveraging of consumer demand for the Birkin bag to compel the purchase of ancillary products is inherently unfair, serving only to increase Hermès' profits while financially burdening consumers. The Northern District of California has also recognized that business practices that compel consumers to make purchases they would not otherwise make may be "unfair" under the UCL. In *Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204, 1215 (9th Cir. 2020), the court found that practices which effectively "force" consumers into certain purchasing decisions, particularly where the defendant wields considerable market power, may qualify as unfair. Here, Hermès' practice of tying the Birkin bag to other purchases restricts consumer choice in a way that courts recognize as "unfair" under the UCL.

### c) The "Fraudulent" Prong of the UCL

The "fraudulent" prong of the UCL prohibits business practices that are likely to deceive the public, and

– 14 –

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT (CASE NO. 3:24-CV-01707-JD)**

1  a plaintiff need only show that "members of the public are likely to be deceived" by the defendant's
2  conduct. *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197, 211 (1983).
3  This standard is objective, focusing on the effect of the conduct on a reasonable consumer, and does not
4  require proof of the plaintiff's actual reliance or damages. Plaintiffs allege that Hermès misled consumers
5  by representing the Birkin bag as "available" and by implying that purchasing other Hermès products
6  would guarantee or improve their chances of buying a Birkin. Plaintiffs describe multiple instances in
7  which Hermès' sales associates told consumers that buying other products would increase their likelihood
8  of obtaining a Birkin, despite there being no certainty or transparency regarding the actual effect of these
9  purchases on Birkin eligibility. [SAC, ¶¶ 122-124.] This misrepresentation and omission of material facts
10 are likely to deceive consumers, who reasonably believe that purchasing additional products will lead to a
11 Birkin bag. California courts have held that misleading or deceptive advertising that creates false consumer
12 expectations is sufficient to state a claim under the "fraudulent" prong of the UCL. In *Williams v. Gerber*
13 *Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008), the Ninth Circuit held that an objectively misleading product
14 label, which gave consumers a false impression about the product's contents, was sufficient to state a claim
15 under the UCL's fraudulent prong. Similarly, Hermès' misleading representations about Birkin availability
16 and the lack of disclosure about the requirement to purchase ancillary products creates a false impression
17 that consumers are likely to act on. In *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 865-66 (9th Cir. 2018), the
18 Ninth Circuit further emphasized that material omissions – where a business withholds information that
19 would influence a consumer's purchasing decision – can support a fraudulent UCL claim. Here, Hermès'
20 failure to disclose the requirements for purchasing a Birkin, despite its awareness of consumers' desire for
21 transparency, constitutes a material omission that is likely to mislead consumers.

22 **IV.    CONCLUSION**

23    For the reasons stated above, Plaintiffs respectfully request that the Court deny Defendants' motion to
24 dismiss the SAC. In the alternative, if the Court finds any deficiencies in the SAC, Plaintiffs request leave
25 to amend to cure any identified issues.

26 / / /
27 / / /
28 / / /

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FIRST AMENDED CLASS ACTION COMPLAINT (CASE NO. 3:24-CV-01707-JD)**

Dated: November 22, 2024  **HAFFNER LAW**

By: /s/ Alfredo Torrijos
Joshua H. Haffner
Alfredo Torrijos
Vahan Mikayelyan

**SETAREH LAW GROUP**
Shaun C. Setareh
Thomas A. Segal

*Attorneys for Plaintiffs and the Proposed Class*